## WISCONSIN CENTRAL RAILROAD COMPANY *v.* PRICE COUNTY

ERROR TO THE SUPREME COURT OF THE STATE OF WISCONSIN.

No. 76.. Argued and submitted November 6, 7, 1889.—Decided March 3, 1890.

No State has power to tax the property of the United States within its limits.

Where Congress has prescribed conditions upon which portions of the public domain may be alienated, and has provided that upon the performance of the conditions a patent shall issue to the donee or purchaser, and all such conditions have been complied with and the tract to be alienated is distinctly defined, and nothing remains but to issue the patent, then the donee or purchaser is to be treated as the beneficial owner of the land, holding it as his own property, subject to state and local taxation; but when an official executive act, prescribed by law, remains to be done before the tract can be distinctly defined, and before a patent can issue, the legal and equitable titles remain in the United States, and the land is not subject to local taxation.

The act of the Secretary of the Interior in approving the selection of indemnity lands by a railroad land-grant company, to supply deficiencies in selections within the place limits, is judicial, and until it is done the company has no equitable right in the selected tracts; and this rule is not affected by the fact that such a refusal was given under a mistake of law, and was subsequently withdrawn, and an assent given.

A mere dictum in an opinion, not essential to the decision, is not authoritative and binding.

IN April, 1884, the plaintiff in this suit, the Wisconsin Central Railroad Company, a corporation created under the laws of Wisconsin, was the owner of certain lands situated in the town of Worcester, in the county of Price, in that State, and had a patent for them from the State bearing date on the 25th of February, 1884, upon which taxes had, in the year 1883, been assessed by that county, although, as claimed by the plaintiff, the title to a part of these lands was at that time in the United States, and to the remainder of them in the State of Wisconsin. Upon a claim that the lands were thus exempt from taxation, the plaintiff, in April, 1884, brought the present suit in a Circuit Court of the State, to obtain its judgment

that the state taxes were illegal, and to enjoin proceedings for their enforcement.

The facts, out of which this claim that the lands were exempt from taxation arose, are briefly these: On the 5th of May, 1864, Congress passed an act making a grant of lands to the State of Wisconsin to aid in the construction of three distinct lines of railway between certain designated points. 13 Stat. 66, c. 80. One of these lines is now held by the plaintiff. The grant in aid of it is in the third section of the act, the language of which is as follows: '

"That there be, and is hereby, granted to the State of Wisconsin, for the purpose of aiding in the construction of a railroad from Portage City, Berlin, Doty's Island, or Fond du Lac, as said State may determine, in a northwestern direction, to Bayfield, and thence to Superior, on Lake Superior, every alternate section of public land, designated by odd numbers, for ten sections in width on each side of said road, upon the same terms and conditions as are contained in the act granting lands to said state, to aid in the construction of railroads in said state, approved June three, eighteen hundred and fifty-six. But in case it shall appear that the United States have, when the line or route of said road is definitely fixed, sold, reserved, or otherwise disposed of, any sections or parts thereof, granted as aforesaid, or that the right of preemption or homestead has attached to the same, that it shall be lawful for any agent or agents of said state, appointed by the governor thereof, to select, subject to the approval of the Secretary of the Interior, from the lands of the United States nearest to the tier of sections above specified, as much public land in alternate sections, or parts of sections, as shall be equal to such lands as the United States have sold or otherwise appropriated, or to which the right of preëmption or homestead has attached as aforesaid, which lands (thus selected in lieu of those sold and to which the right of preëmption or homestead has attached as aforesaid, together with sections and parts of sections designated by odd numbers as aforesaid, and appropriated as aforesaid) shall be held by said state, or by the company to which she may transfer the same, for the

use and purpose aforesaid: *Provided*, That the lands to be so located shall in no case be further than twenty miles from the line of said road."

The seventh section enacted: "That whenever the companies to which this grant is made, or to which the same may be transferred shall have completed twenty consecutive miles of any portion of said railroads, supplied with all necessary drains, culverts, viaducts, crossings, sidings, bridges, turnouts, watering places, depots, equipments, furniture, and all other appurtenances of a first-class railroad, patents shall issue conveying the right and title to said lands to the said company entitled thereto, on each side of the road, so far as the same is completed and coterminous with said completed section, not exceeding the amount aforesaid, and patents shall in like manner issue as each twenty miles of said road is completed: *Provided, however*, That no patents shall issue for any of said lands unless there shall be presented to the Secretary of the Interior a statement, verified on oath or affirmation by the president of said company, and certified by the governor of the state of Wisconsin, that such twenty miles have been completed in the manner required by this act, and setting forth with certainty the points where such twenty miles begin and where the same end; which oath shall be taken before a judge of a court of record of the United States."

The ninth section declared: "That if said road mentioned in the third section aforesaid is not completed within ten years from the time of the passage of this act, as provided herein, no further patent shall be issued to said company for said lands, and no further sale shall be made, and the lands unsold shall revert to the United States."

By the act of Congress of April 9, 1874, the time for the completion of the road and for the reversion of the lands was extended to December 31, 1876. 18 Stat. 28, c. 82.

All the lands embraced by section three of the act of 1864 were granted in 1866 by the State of Wisconsin to the Portage and Lake Superior Railroad Company and to the Winnebago and Superior Railroad Company, respectively, companies which had been incorporated under the laws of that State.

Private and Local Laws of Wisconsin of 1866, c. 314, § 8; c. 362, § 9. In 1869 the consolidation of these two companies, under the name of the Portage, Winnebago and Superior Railroad Company, was authorized by the State, and, in 1871, the name of the consolidated company was changed to the Wisconsin Central Railroad Company, the plaintiff in this suit.

The Portage, Winnebago and Superior Railroad Company duly filed the location of its road from Stevens' Point to Bayfield on October 7, 1869; and in December following the Commissioner of the General Land Office withdrew from sale, preëmption and homestead entry the odd-numbered sections of land within the twenty-miles limit along the line of the location. The road was built in sections of twenty miles each. Section six and portions of sections five and seven fell within Price County. Section five was completed in February, 1874, section six in December, 1876, and section seven in June, 1877.

The whole number of acres in the odd-numbered sections along the line of the railroad within the ten-mile limits was 1,377,383.93. Of this number 789,622 acres had been disposed of by the United States before the act of May 5, 1864, was passed, and 161,659.53 were disposed of after its passage and before the line of the road was located in October, 1869.

The plaintiff, the Wisconsin Central Railroad Company, received from the United States, prior to November 16, 1877, patents for the 240,363.54 acres within the place limits, that is, within ten miles on either side of the line of the road as located, and patents for 203,459.62 acres within the indemnity limits, that is, between ten and twenty miles of the line of the road. On January 9, 1878, the company received from the United States a patent for 162,622.89 acres, and on August 10, 1878, a patent for 29,398.51 acres, both of these patents covering land within the place limits. No other patents were issued by the United States to the company previous to the commencement of this suit, and the patents issued did not include the land upon which the taxes were assessed, to restrain the collection of which the suit is brought. Of the lands in question, eleven parcels of forty acres each lay within

the place limits. The remainder of the lands lay within the indemnity limits. A list of selections of lands within the place limits claimed by the company on account of the sixth section of the road from Stevens' Point to Bayfield, was filed in the local land office on December 5, 1876; they included, among other lands, the eleven forties mentioned. A list of selections of land within the indemnity limits claimed by the company on account of the same section of railway, was filed in that office on the 9th and 15th of December, 1876; they included the remainder of the lands referred to in the complaint. Repeated demands were made by the railroad company, from the time these lists were filed until after the trial of this cause, for patents covering the lands referred to, but no patents were granted for any of them. A full statement of the efforts to secure patents is given in the testimony of the vice-president and general legal manager of the company.

It appears from this statement, the accuracy of which is not questioned in any particular, that up to the time of the decision of this court in *Leavenworth, Lawrence & Galveston Railroad* v. *United States*, 92 U. S. 733, which was rendered in April, 1876, it had been the practice of the Land Department to allow grantees by the United States of land to aid in the construction of railroads, whose grants were similar in their terms to the one under consideration here, to take land from the indemnity limits in lieu of lands sold or otherwise disposed of by the United States prior to the passage of the act, and of lands to which a preëmption or homestead right had previously attached; but that this practice was subsequently changed in consequence of the language of the court in that case and its supposed decision that indemnity could be allowed only for such lands as were sold or reserved or otherwise disposed of, or to which the right of preëmption or homestead had attached, between the passage of the act and the time the line or route of the road was definitely fixed.

The Commissioner of the General Land Office, in a letter addressed to the Secretary of the Interior, under date of November 16, 1877, contained in the record, stated that this practice had existed since the inauguration of the railroad land

grant system, but that it would appear from the decision in question that the practice was erroneous; that indemnity could only be allowed for lands sold or disposed of after the passage of the granting act, and applying that rule to the grant under consideration the company had received patents for 41,820.09 acres in excess of the indemnity authorized. The Secretary of the Interior, in answer to this letter, under date of December 26, 1877, referred to the decision of the Supreme Court, and held in pursuance of it that lands sold or disposed of by the United States prior to the passage of the act granting lands to the State of Wisconsin were excepted from the operation of the grant, and that indemnity could not be obtained for the lands thus lost — citing from the opinion of the court to show that such was its decision. The Secretary concluded by stating that in accordance with that rule the company had already received 41,820.09 acres in excess of what it was entitled to, and instructed the commissioner to call upon the company to relinquish its claim to that quantity of land, in order that it might be restored to the public domain. Repeated efforts were afterwards made by the agents of the company to induce the Secretary of the Interior to change his views upon that point, but without success. Accordingly, no selections of indemnity lands for lands lost from the grant within the place limits along the line of the constructed road known as section six were ever approved by him, and no patents of the United States were issued for such lands, or for any lands within the place limits along that section, until after this suit was commenced.

Having failed to secure any patent from the United States, the plaintiff made application in February, 1884, to the State of Wisconsin for a patent, and, on the 25th of that month, a patent by the State was issued to it embracing the lands mentioned in the complaint. When application was thus made to the officials of the State, a careful examination was had by them of the selections in order to determine whether any of the parcels were swamp lands.

There was no controversy concerning the facts of the case, and the trial court found substantially as follows:

1. That the lands described in the complaint were all wild,

unoccupied, and unimproved and situated in the town of Worcester in the county of Price, and were a portion of the lands granted to the State by the third section of the act of Congress of May 5, 1864, for the purpose of constructing what is now the plaintiff's railroad.

2. That eleven forties of the land described were situated within the ten-mile limits of said grant, and all the rest within the indemnity limits, and all in odd-numbered sections.

3. That all of said lands were assessed in that town in 1883 and put on the tax-roll, and the amount of tax carried out against each respective piece, but were not assessed to the plaintiff by name, or to any one else, or to " unknown owners," and that none of the real estate included in the assessment-roll for that year was assessed to the owners thereof; that a warrant was attached to said tax-roll and the roll, with said warrant attached, placed in the hands of the town treasurer for collection; that the taxes were unpaid thereon, and the town treasurer returned the same to the county treasurer as delinquent.

4. That on the 25th of February, 1884, the plaintiff received a patent from the State for all said lands, and thereby acquired the absolute title in fee to the same; that until then the plaintiff could get no title to the lands and had no right to sell or convey the same; that until they were segregated and identified and the grant applied thereto, the grant was " a float."

5. That the plaintiff's right to the lands was in dispute between the State and the United States; that said lands and others were withheld from the State and the plaintiff by the Secretary of the Interior, and thereby the issue of patents therefor by the United States was delayed; that the plaintiff did not in any manner cause the delay, but, on the contrary, was diligent and persistent in its efforts to procure the patents; that the delay in their issue was caused entirely by the government of the United States and the General Land Office, against the protest of both the plaintiff and the State, and in spite of continued and unintermitted efforts made by both to obtain their issue by the Interior Department.

6. That the lands described had at the time the taxes were levied and assessed thereon in 1883 been selected as lands to which said land grant applied, but said selections had not been approved by the Secretary of the Interior and had not been certified to the State, or in any manner identified as lands for which the plaintiff would eventually receive patents, but, on the contrary, the Secretary of the Interior refused to recognize the right of the State to the lands or to approve the selections made.

As conclusions of law the court found, in effect:

1. That it was not the intent and meaning of the act of Congress that said lands should be subject to taxation until they had been earned by the plaintiff and patented by the United States; that while they had been in truth earned by the plaintiff before they were assessed for taxation, yet the plaintiff's right to the same and to patents therefor had been denied by the Secretary of the Interior; that the plaintiff could not exercise control over them until it should be determined whether it was entitled to receive patents for them as part of the lands granted.

2. That the lands were "a float" as long as the plaintiff's right thereto was not admitted and recognized by the Secretary of the Interior, but denied and disputed by him and patents therefor withheld by him against the will and request of the plaintiff, and hence during such time the lands were not subject to taxation by the State.

3. That said lands were not subject to taxation in 1883, and that the taxes levied and assessed thereon for that year were illegal and void for the reason that said lands were then exempt from taxation.

4. That said tax was a cloud upon the plaintiff's title to said lands, and it was, therefore, entitled to the relief prayed for in the complaint.

Upon these findings judgment in favor of the plaintiff perpetually restraining the defendants from collecting said taxes was entered. The defendants appealed to the Supreme Court of the State, by which the judgment below was reversed, and the cause remanded to the Circuit Court with directions to

dismiss the complaint. 64 Wisconsin, 579. To review this latter judgment the cause was brought to this court on writ of error.

Mr. *Louis D. Brandeis* and Mr. *Jeremiah Smith* (with whom was Mr. *Edwin H. Abbot* on the brief) for plaintiff in error.

Mr. *Willis Hand,* Mr. *M. Barry* and Mr. *John C. Spooner,* for defendants in error, submitted on their brief.

Mr. JUSTICE FIELD, after stating the case, delivered the opinion of the court.

It is familiar law that a State has no power to tax the property of the United States within its limits. This exemption of their property from state taxation — and by state taxation we mean any taxation by authority of the State, whether it be strictly for state purposes or for mere local and special objects — is founded upon that principle which inheres in every independent government, that it must be free from any such interference of another government as may tend to destroy its powers or impair their efficiency. If the property of the United States could be subjected to taxation by the State, the object and extent of the taxation would be subject to the State's discretion. It might extend to buildings and other property essential to the discharge of the ordinary business of the national government, and in the enforcement of the tax those buildings might be taken from the possession and use of the United States. The Constitution vests in Congress the power to " dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." And this implies an exclusion of all other authority over the property which could interfere with this right or obstruct its exercise. *Van Brocklin* v. *State of Tennessee,* 117 U. S. 151, 168.

This doctrine of exemption from taxation of the property of the United States, so far as lands are concerned, is in express

terms affirmed in the constitution of Wisconsin, which ordains that the State "shall never interfere with the primary disposition of the soil within the same by the United States, nor with any regulations Congress may find necessary for securing the title in such soil to *bona fide* purchasers thereof; and no tax shall be imposed on land the property of the United States." Constitution of 1848, Art. II, sec. 2.

It follows that all the public domain of the United States within the State of Wisconsin was in 1883 exempt from state taxation. Usually the possession of the legal title by the government determines both the fact and the right of ownership. There is, however, an exception to this doctrine with respect to the public domain, which is as well settled as the doctrine itself, and that is, that where Congress has prescribed the conditions upon which portions of that domain may be alienated, and provided that upon the performance of the conditions a patent of the United States shall issue to the donee or purchaser, and all such conditions are complied with, the land alienated being distinctly defined, it only remaining for the government to issue its patent, and until such issue holding the legal title in trust for him, who in the meantime is not excluded from the use of the property — in other words, when the government has ceased to hold any such right or interest in the property as to justify it in withholding a patent from the donee or purchaser, and it does not exclude him from the use of the property — then the donee or purchaser will be treated as the beneficial owner of the land, and the same be held subject to taxation as his property. This exception to the general doctrine is founded upon the principle that he who has the right to property, and is not excluded from its enjoyment, shall not be permitted to use the legal title of the government to avoid his just share of state taxation.

Thus, in *Carroll* v. *Safford*, 3 How. 441, 461, the complainant had entered certain lands belonging to the United States, in the local land office, paid for them the required price, and received from the office a land certificate. Patents were issued for them, but, before their issue, the lands were assessed for taxation and sold for the taxes. The question whether

they were subject to taxation by the State after their entry and before the patents were issued was answered in the affirmative. Said the court: "When the land was purchased and paid for, it was no longer the property of the United States, but of the purchaser. He held for it a final certificate, which could no more be cancelled by the United States than a patent;" and again: "It is said the fee is not in the purchaser, but in the United States, until the patent shall be issued. This is so, technically, at law, but not in equity. The land in the hands of the purchaser is real estate, descends to his heirs, and does not go to his executors or administrators." And again: "Lands which have been sold by the United States can in no sense be called the property of the United States. They are no more the property of the United States than lands patented. So far as the rights of the purchaser are considered, they are protected under the patent certificate as fully as under the patent. Suppose the officers of the government had sold a tract of land, received the purchase money, and issued a patent certificate: can it be contended that they could sell it again, and convey a good title? They could no more do this than they could sell land a second time which had been previously patented. When sold, the government, until the patent shall issue, holds the mere legal title for the land in trust for the purchaser; and any second purchaser would take the land charged with the trust."

In *Witherspoon* v. *Duncan*, 4 Wall. 210, 218, a similar question arose and was in like manner answered. Said the court: "In no just sense can lands be said to be public lands after they have been entered at the land office and a certificate of entry obtained. If public lands before the entry, after it they are private property. If subject to sale, the government has no power to revoke the entry and withhold the patent. A second sale, if the first was authorized by law, confers no right on the buyer, and is a void act;" and again: "The contract of purchase is complete when the certificate of entry is executed and delivered, and thereafter the land ceases to be a part of the public domain. The government agrees to make proper conveyance as soon as it can, and in the meantime

holds the naked legal fee in trust for the purchaser, who has the equitable title." See, also, *Railway Co.* v. *Prescott*, 16 Wall. 603, 608; *Railway Co.* v. *McShane*, 22 Wall. 444, 461.

In the light of these decisions, it will be necessary, in order to determine the liability of the property held by the plaintiff to taxation in 1883, to consider the nature and extent of its interest in the property at that time acquired under the grant of Congress of May, 1864, and by its subsequent construction of the road.

Numerous grants of land were made by Congress between 1860 and 1880 to aid in the construction of railroads; some directly to incorporated companies, others to different States, the lands to be by them transferred to companies by whom the construction of the roads might be undertaken. The different acts making these grants were similar in their general provisions, and so many of them have been, at different times, before this court for consideration that little can be said of their purport and meaning, the title they transfer, and the conditions upon which the lands could be used and disposed of, which has not already and repeatedly been said in its decisions. Each grant gave a specified quantity of lands, designated by sections along the route of the proposed road, with the exception of such as might, when the line of the road should be definitely fixed, have been disposed of or reserved by the government, or to which a preëmption or homestead right might then have attached. For these excepted sections, which otherwise would have been taken from those designated along the line of the road, other lands beyond those sections within a specified distance were allowed to be selected. The title conferred was a present one, so as to insure the donation for the construction of the road proposed against any revocation by Congress, except for non-performance of the work within the period designated, accompanied, however, with such restrictions upon the use and disposal of the lands as to prevent their diversion from the purposes of the grant. It was the practice of the Land Department, as shown by the evidence in this record, up to the decision of *Leavenworth, Lawrence & Galveston Railroad Co.* v. *United States*, in April, 1876, 92 U. S.

733, to allow deficiencies in the quantity of land intended to be granted, arising from sales or other disposition made before the date of the grant, as well as those made subsequently, and those arising from the attachment of preëmption or homestead rights, to be supplied from lands lying beyond the original sections, within what were termed the indemnity limits. This practice was held in *Winona & St. Peter Railroad Co.* v. *Barney* to have been correct. 113 U. S. 618, 625. As the court there said: "The policy of the government was to keep the public lands open at all times to sale and preëmption, and thus encourage the settlement of the country, and, at the same time, to advance such settlement by liberal donations to aid in the construction of railways. The acts of Congress, in effect, said: 'We give to the State certain lands to aid in the construction of railways lying along their respective routes, provided they are not already disposed of, or the rights of settlers under the laws of the United States have not already attached to them, or they may not be disposed of or such rights may not have attached when the routes are finally determined. If at that time it be found that of the lands designated any have been disposed of, or rights of settlers have attached to them, other equivalent lands may be selected in their place, within certain prescribed limits.' The encouragement to settlement by aid for the construction of railways was not intended to interfere with the policy of encouraging such settlement by sales of the land, or the grant of preëmption rights." The court accordingly held that the indemnity clause covered losses from the grant by reason of sales and the attachment of preëmption rights previous to the date of the act, as well as by reason of sales and the attachment of preëmption rights between that date and the final determination of the route of the road.

After the decision of the court in the Leavenworth case the Land Department changed its practice and refused to allow the deficiencies, arising from sales or other disposition made, or from the attachment of preëmption or homestead rights before the date of the act, to be made up from selections within the indemnity limits. But that decision did not warrant the change. The question in that case was not, for what deficien-

cies indemnity could be had, but what lands could be taken for deficiencies which existed. If what was then said indicated that deficiencies which could be supplied were limited to such as might arise after the passage of the act, it was a mere dictum not essential to the decision, and therefore not authoritative and binding. The refusal of the Land Department, therefore, to allow the deficiencies arising in the sections within the place limits in this case to be supplied by selections from the indemnity lands, and to issue patents of the United States for them, was erroneous.

The question now arises as to how far this refusal affected the legal or equitable title of the company to the lands taxed in 1883, for which it only obtained a patent in 1884. The lands taxed amounted to eleven parcels of forty acres each lying within the original sections named in the grant, that is, within the ten miles limit from the line of the road, and the remainder were within the indemnity limits. Neither were allowed, because, by excluding the deficiencies arising before the date of the grant from indemnity, the whole amount of the lands granted had already been patented. So far as the eleven parcels of forty acres each are concerned, the right of the plaintiff to them and to a patent for them had as early as 1877 become complete under the terms of the granting act. The line of the railroad had been definitely fixed on the 7th of October, 1869 ; and the three twenty-mile sections, numbers five, six, and seven, were all completed in June, 1877, and supplied with the buildings and appurtenances specified in the act to entitle the company to patents for them from the United States. The title conferred by the grant was necessarily an imperfect one, because, until the lands were identified by the definite location of the road, it could not be known what specific lands would be embraced in the sections named. The grant was, therefore, until such location, a float. But when the route of the road was definitely fixed, the sections granted became susceptible of identification, and the title attached to them and took effect as of the date of the grant, so as to cut off all intervening claims. *Schulenberg* v. *Harriman*, 21 Wall. 44, 60; *Leavenworth &c. Railroad* v. *United States*, 92 U. S.

733, 741; *Missouri, Kansas & Texas Railroad Co.* v. *Kansas Pacific Railway Co.*, 97 U. S. 491, 496; *Railway Co.* v. *Baldwin*, 103 U. S. 426, 429. The road having been built as early as June, 1877, and supplied, as required, with the appurtenances specified, the company was entitled to have the restrictions upon the use of the land released. It had then, to the eleven forty-acre parcels which were capable of identification, an indefeasible right or title; it matters not which term be used. The subsequent issue of the patents by the United States was not essential to the right of the company to those parcels, although in many respects they would have been of great service to it. They would have served to identify the lands as coterminous with the road completed; they would have been evidence that the grantee had complied with the conditions of the grant, and to that extent that the grant was relieved of possibility of forfeiture for breach of them; they would have obviated the necessity of any other evidence of the grantee's right to the lands; and they would have been evidence that the lands were subject to the disposal of the railroad company with the consent of the government. They would have been in these respects deeds of further assurance of the patentee's title, and, therefore, a source of quiet and peace to it in its possessions.

There are many instances in the reports where such effect as is here stated has been given to patents authorized or directed to be issued to parties, notwithstanding they had previously received a legislative grant of the premises, or their title had been already confirmed. In *Langdeau* v. *Hanes*, 21 Wall. 521, 529, we have one of that kind. There, this court said: "In the legislation of Congress a patent has a double operation. It is a conveyance by the government, when the government has any interest to convey; but where it is issued upon the confirmation of a claim of a previously existing title, it is documentary evidence, having the dignity of a record, of the existence of that title, or of such equities respecting the claim as justify its recognition and confirmation. The instrument is not the less efficacious as evidence of previously existing rights because it also embodies words of release or transfer

from the government." We are of opinion, therefore, that these eleven forty-acre parcels were in 1883 subject to taxation by the State of Wisconsin. The lands had become the property of the railroad company, and there was nothing to hinder their use and enjoyment. For that purpose it is immaterial whether it be held that the company then had a legal and indefeasible title to the lands, or merely an equitable title to them to be subsequently perfected by patents from the government.

But as to the remainder of the lands taxed, which fell within the indemnity limits, the case is different. For such lands no title could pass to the company not only until the selections were made by the agents of the State appointed by the governor, but until such selections were approved by the Secretary of the Interior. The agent of the State made the selections, and they had been properly authenticated and forwarded to the Secretary of the Interior. But that officer never approved of them. Nor can such approval be inferred from his not formally rejecting them. He refused, as already stated, to issue to the company any patents for any more lands, insisting that it had already received over 40,000 acres too much, and he directed the Commissioner of the General Land Office to require the company to restore this excess to the government. The approval of the Secretary was essential to the efficacy of the selections, and to give to the company any title to the lands selected. His action in that matter was not ministerial but judicial. He was required to determine, in the first place, whether there were any deficiencies in the land granted to the company which were to be supplied from indemnity lands; and, in the second place, whether the particular indemnity lands selected could be properly taken for those deficiencies. In order to reach a proper conclusion on these two questions he had also to inquire and determine whether any lands in the place limits had been previously disposed of by the government, or whether any preëmption or homestead rights had attached before the line of the road was definitely fixed. There could be no indemnity unless a loss was established. And in determining whether a particular selection could be

taken as indemnity for the losses sustained, he was obliged to inquire into the condition of those indemnity lands, and determine whether or not any portion of them had been appropriated for any other purpose, and if so, what portion had been thus appropriated, and what portion still remained. This action of the Secretary was required, not merely as supervisory of the action of the agent of the State, but for the protection of the United States against an improper appropriation of their lands. Until the selections were approved there were no selections in fact, only preliminary proceedings taken for that purpose; and the indemnity lands remained unaffected in their title. Until then, the lands which might be taken as indemnity were incapable of identification; the proposed selections remained the property of the United States. The government was, indeed, under a promise to give the company indemnity lands in lieu of what might be lost by the causes mentioned. But such promise passed no title, and, until it was executed, created no legal interest which could be enforced in the courts. The doctrine, that until selection made no title vests in any indemnity lands, has been recognized in several decisions of this court. Thus in *Ryan* v. *Railroad Co.*, 99 U. S. 382, 386, in considering a grant of land by Congress, in aid of the construction of a railroad, similar in its general features to the one in this case, the court said: "Under this statute, when the road was located and the maps were made, the right of the company to the odd sections first named became *ipso facto* fixed and absolute. With respect to the 'lieu lands,' as they are called, the right was only a float, and attached to no specific tracts until the selection was actually made in the manner prescribed." And again, speaking of a deficiency in the land granted, it said: "It was within the secondary or indemnity territory where that deficiency was to be supplied. The railroad company had not and could not have any claim to it until specially selected, as it was, for that purpose." The selection had been approved by the Secretary.

In *St. Paul &c. Railroad* v. *Winona &c. Railroad*, 112 U. S. 720, 731, the court, speaking of a previous decision, said: "The reason of this is that, as no vested right can attach to the lands

in place — the odd-numbered sections within six miles of each side of the road — until these sections are ascertained and identified by a legal location of the line of the road, so in regard to the lands to be selected within a still larger limit, their identification cannot be known until the selection is made. It may be a long time after the line of the road is located before it is ascertained how many sections, or parts of sections, within the primary limits have been lost by sale or preëmption. It may be still longer before a selection is made to supply this loss."

In *Sioux City &c. Railroad* v. *Chicago &c. Railway*, 117 U. S. 406, 408, where the railroad grant as to indemnity lands was substantially similar to the one in this case, and one of the questions was as to the title to the indemnity lands, the court said : "No title to indemnity lands was vested until a selection was made by which they were pointed out and ascertained, and the selection made approved by the Secretary of the Interior."

In *Barney* v. *Winona &c. Railroad*, 117 U. S. 228, 232, the court said : "In the construction of land-grant acts, in aid of railroads, there is a well-established distinction observed between 'granted lands' and 'indemnity lands.' The former are those falling within the limits specially designated, and the title to which attaches when the lands are located by an approved and accepted survey of the line of the road filed in the Land Department, as of the date of the act of Congress: The latter are those lands selected in lieu of parcels lost by previous disposition or reservation for other purposes, and the title to which accrues only from the time of their selection."

The same view has been held by different Attorneys General of the United States, in their official communications to heads of the departments, where selections of the public lands have been granted, subject to the approval of the Secretary of the Interior, *Cape Mendocino Lighthouse Site*, 14 Opinions Attys. Gen. 50, *Portage Land Grant*, Ib. 645, and such has been the consistent practise of the Land Department. The uniform language is, that no title to indemnity lands becomes vested in any company or in the State until the selections are made;

and they are not considered as made until they have been approved, as provided by statute, by the Secretary of the Interior.

It follows from these views that the indemnity lands described in the complaint were not subject to taxation as the property of the railroad company in 1883. The judgment of the Supreme Court of Wisconsin must, therefore, be

*Reversed, and the cause remanded with directions to enter a decree perpetually enjoining the collection of the taxes levied in the year 1883 upon the indemnity lands, and dismissing the complaint as to the eleven parcels of forty acres each; and it is so ordered.*