UNITED STATES v. RIDGELY et al.

(Circuit Court of Appeals, Eighth Circuit. January 6, 1920.)

No. 5334.

PUBLIC LANDS ⬥⟹53—APPROVAL OF COMMISSIONER REQUISITE TO ACQUISITION OF RIGHTS IN INDEMNITY LANDS.

A state, which was owner of school land included within a national forest reserve, by selecting and making application for lieu land in compliance with the statutes and regulations, acquires no estate, legal or equitable, in the land selected, as against the United States, prior to approval of its application by the Commissioner of the General Land Office, and pending such approval it is subject to withdrawal from selection as mineral land.

Appeal from the District Court of the United States for the District of Wyoming; John A. Riner, Judge.

Suit in equity by the United States against H. S. Ridgely and others Decree for defendants, and the United States appeals. Reversed.

Henry F. May, Sp. Asst. Atty. Gen. (Charles L. Rigdon, U. S. Atty. of Cheyenne, Wyo., on the brief), for the United States.

John W. Lacey, of Cheyenne, Wyo. (D. A. Preston, of Cheyenne, Wyo., William L. Walls, Atty. Gen., of Wyoming, and Herbert V. Lacey and Hilliard S. Ridgely, both of Cheyenne, Wyo., on the brief), for appellees.

Edwin A. Meserve, Shirley C. Ward, and Jefferson Chandler, all of Los Angeles, Cal., amici curiæ.

Before HOOK and STONE, Circuit Judges, and AMIDON, District Judge.

AMIDON, District Judge. The state of Wyoming was admitted by act of Congress on July 10, 1890 (26 Stat. 224), which granted to it sections 16 and 36 for educational purposes, with certain indemnity lands in place thereof in case they had been otherwise disposed of; the indemnity lands to be selected with the approval of the Secretary of the Interior. Under this grant the state acquired a perfect title to

a certain section 36. On February 22, 1897, the Big Horn National Forest Reserve, created by proclamation of the President (29 Stat. 909), included within its outer boundaries the section referred to, at a time when title thereto had vested absolutely in the state.

On April 4, 1912, the state filed in the proper local land office its application under the provisions of the act of Congress of July 10, 1890 (26 Stat. 222), and sections 2275 and 2276 of the Revised Statutes, and the acts amendatory thereof (Comp. St. §§ 4860, 4861), for the tract of land involved in the present suit as indemnity for a part of said section 36. The state did everything necessary to show a perfect title to the land relinquished and perfect relinquishment thereof to the government, and everything that was required either by statute or regulation of the Land Department to select the land here involved as indemnity for the land so relinquished. Among other things in the showing was an affidavit that the land applied for contained no known deposits of mineral or petroleum, and it was stipulated at the hearing that at the time the application was filed the land "had been classified by the government in no way as mineral lands." The filing of the application was allowed by the local land office, publication ordered, the receipt of the publication fee accepted, and all the papers submitted by the state were sent to the Commissioner of the General Land Office on April 30, 1912, with proper certificate of the local officials, showing that the records in their office disclosed no adverse claims to the land selected.

On May 6, 1914, the President, under the terms of the act of June 25, 1910 (36 Stat. 847 [Comp. St. §§ 4523–4525]), withdrew as oil land the tract so applied for by the state.

On April 29, 1915, the Commissioner of the General Land Office caused notice to be given to the state advising it that, inasmuch as the tract applied for had been withdrawn as oil land, certification of the selection, if made, would contain a reservation of the petroleum deposits under the act of July 17, 1914 (38 Stat. 510 [Comp. St. § 4640c]), unless the state within 30 days filed an application for classification of said land as nonmineral, together with a showing, in which event the state would be allowed a hearing to show that the tract was not valuable for petroleum.

On May 24 of the following year, 1916, the state made what purported to be a lease of the property to defendant Ridgely, for the purpose of drilling for oil thereon, which lease was thereafter by mesne conveyance assigned to defendant Midwest Refining Company.

By letter dated the day following the date of the lease, to wit, May 25, 1916, the state replied to the notice given under instructions of the Commissioner last above referred to, declining to accept a surface patent, so called, and, instead of asking for a hearing as to the character of the land, claimed that an equitable title had vested in it by virtue of its compliance with the laws and regulations in its application for selection of April 4, 1912.

Thereafter, on August 17, 1916, the Commissioner of the General Land Office held the selection for cancellation, on the grounds that the land had been withdrawn as oil lands and had been shown to be

such. An appeal was taken by the state to the Secretary of the Interior, and the decision of the Commissioner was affirmed on October 25, 1916, and this decision was made final by the Secretary of the Interior on February 26, 1917, on petition for rehearing.

Going back, now, to developments on the land, in the year 1916 drilling for oil was undertaken by the defendant Midwest Refining Company, and carried on to discovery and subsequent production. But no discovery was made or drilling commenced until after May 24, 1916, the date of the lease to Ridgely, and nearly a year after the letter of July 29, 1915, from the Commissioner to the state of Wyoming, notifying it that, if the selection were allowed, it would contain a reservation of the petroleum deposits. Since that time production has been carried on by defendant Midwest Refining Company, and is now being carried on by it from a number of wells making a large production. This suit was brought by the United States to enjoin the continuing trespass involved in such drilling and operation and exhaustion of the oil content of the land, to quiet title in the government, and to cancel the various instruments relied on by defendants, as supporting their claim of an equitable title thereto, and for an accounting. The state intervened in the action. It and the other defendants filed separate answers. Evidence was adduced, showing the facts substantially as above recited. The trial court dismissed the bill upon the merits, and the present appeal seeks a review of that decision.

It is stated in the briefs, and was referred to in the oral arguments, that it is the purpose of all parties in this case to present squarely the question whether or not the state can obtain title to lieu lands by filing its application for selection and complying with all the requirements of the statutes, rules, and regulations on its part to be complied with, although its selection never was approved, but prior to action thereon by the Commissioner of the General Land Office and while the application for the selected land was pending before him, the land applied for was shown to be oil land, and withdrawn as such, and upon those grounds the selection was rejected.

We think that it has been clearly determined by the Supreme Court that the state, down to the time of the approval of the application by the Commissioner of the General Land Office, acquires no estate, legal or equitable, in the lands applied for *as against the government*. The only right which it acquires by its application and the proceedings in the local land office is to be protected against any subsequent right in the tract being acquired by *private parties* in case the government decides to dispose of the lands as agricultural lands.

This in our judgment is placed beyond controversy by the decision of the Supreme Court in Wisconsin Railroad Co. v. Price County, 133 U. S. 496, 511, 512, 10 Sup. Ct. 341, 33 L. Ed. 687, and more particularly by the decision in Cosmos Co. v. Gray Eagle Oil Co., 190 U. S. 301, 23 Sup. Ct. 692, 24 Sup. Ct. 860, 47 L. Ed. 1064. The latter case is directly in point. There are minor circumstances in which it differs from the present case, but none of these constitutes a substantial ground of distinction.

In brief, the Cosmos Case holds that the local officials are not vested with any jurisdiction to pass upon any of the questions, either of law or fact, involved in the application. Their power is confined to accepting the state's papers, making the proper notation ·upon their records to protect the application against subsequent rights of private parties, and then transmitting the papers, with a certificate showing the tract to be free from adverse claims so far as disclosed by the records in their office, to the Commissioner of the General Land Office. That officer is clothed with jurisdiction, not only to pass upon the paper showing made by the state, but to make any investigation which he sees fit to determine whether the lands are nonmineral, so as to come within the statutes controlling the application. Until he approves of the application, there is, as Mr. Justice Field said in the Price County Case, 133 U. S. 511, 10 Sup. Ct. 341, 33 L. Ed. 687, no selection. In other words, the favorable action of the Commissioner is an element of the selection, and until that is obtained the state acquires no title, legal or equitable, to the land. In exercising his jurisdiction, the Commissioner is not reviewing the action of the local land officials. His jurisdiction is original and primary. While the case is pending before him, the transaction is simply an application to exchange. The government is as free in that transaction as the state.

The case of Daniels v. Wagner, 237 U. S. 547, 35 Sup. Ct. 740, 59 L. Ed. 1102, L. R. A. 1916A, 1116, Ann. Cas. 1917A, 40, does not impair the authority of the Cosmos Case, but expressly approves it as to the power of the Commissioner to determine the mineral character of the land applied for. All the Daniels Case decides is this: That the applicant for lieu lands, by presenting his application to the local land office, acquires the right *as against private individuals* whose rights in the property arise subsequently, to be protected against such subsequent private rights, and that the Commissioner of the General Land Office in the name of discretion cannot, while holding the lands subject to disposal as agricultural, timber, or desert lands, give the land to a private party whose rights arose after the application to select the indemnity lands was made to the local land office. The Daniels Case has nothing to do with the right of the government to decide any question of fact involved in the application to select the land as indemnity. It simply holds that a private individual, whose rights arise subsequent to the entry of the application in the local land office, cannot be given priority over such applicant. The Supreme Court in the case cited simply holds the Commissioner, in exercising his jurisdiction to dispose of the lands as between private parties, must give effect to the general doctrine of priorities.

In the argument and briefs there is a great array of authorities holding that it is the "known" mineral quality of lands at the time a right to them is acquired which controls in suits to cancel patents, and that the discovery of the mineral character of the land subsequent to the inception of the right does not give the government the right to cancel a patent. The difference between those cases and the present is plain. This is not a suit to cancel a patent or an equitable title. The suit simply involves the question of the right of the government, through

the Commissioner of the General Land Office, to determine whether the lands are of a character subjecting them to plaintiff's claim. Until that question is decided, as we have already stated, the applicant, as against the government, acquires no title in the property, legal or equitable. This is not only established by authority, but is justified by experience. The right to select indemnity lands in lieu of agricultural lands lost, which empowers the selector to range over a whole state in search of lieu lands, has been the agency by means of which great frauds have been perpetrated upon the government. What is "known" about lands some years prior to the time when that knowledge becomes determinative of a right is a difficult field of inquiry. The showing at the time of the filing in the local land office is made wholly by the applicant. It is a paper showing. So far as the government is concerned, it is an ex parte proceeding. The selector is entitled to agricultural lands, and not to mineral lands. The Commissioner of the General Land Office, in the exercise of his jurisdiction to determine whether the lands applied for are such as the applicant is entitled to under the law, may not only make such inquiry through agents as he sees fit, but, if need be, he may make such exploration as is necessary to determine the question upon which he is asked to pass. This is the only way in which the government can be protected against grave frauds in the administration of the public land laws. The power and duty of the Commissioner to determine whether the land is mineral is not dependent on whether some private party has filed a contest. His jurisdiction to protect the United States is certainly as obligatory as to protect the private rights of contestants.

The decree of the District Court is reversed, with directions to the trial court to enter a decree in favor of the plaintiff in accordance with the prayer of the bill, and proceed with the cause.