DRAINAGE DISTRICT NO. 7 OF POINSETT COUNTY v.
EXCHANGE TRUST COMPANY.

Opinion delivered January 9, 1928.

1. PUBLIC LANDS—EFFECT OF CERTIFICATE OF ENTRY.—When a certificate of entry is issued to a purchaser of government land, he acquires the equitable title to the land, and the legal title alone remains in the United States.

2. ESTOPPEL—INCLUSION OF LANDS IN DRAINAGE DISTRICT.—Where persons purchasing land from the United States petitioned for the lands to be annexed to a drainage district, and, after they acquired the equitable title thereto, the lands were annexed to the district, the benefits were reassessed, and the formation of the district and improvements substantially changed, *held* that the purchasers were estopped from attacking the validity of annexation proceedings and the assessment of benefits against their land.

3. EVIDENCE—JUDICIAL NOTICE.—The court will take judicial notice of the length, width and depth of the Mississippi River and the encroachment of the river upon lands adjacent to it in times of flood.

4. EVIDENCE—JUDICIAL NOTICE.—A court will take judicial notice of the vast area of territory of the United States which is drained into the Mississippi River, and the result of the action of the river in flood times upon its bank and levees along the bank.

5. LEVEES AND FLOOD CONTROLS—ASSESSMENT OF UNITED STATES LAND.—Lands of United States included within a levee district were not subject to special assessment for levee purposes, so long as

they belonged to the United States; but when the final certificate was issued to purchasers, the naked legal title only remained in the United States, and the lands became thereafter subject to the annual assessment of levee taxes.

Appeal from Poinsett Chancery Court; *J. M. Futrell,* Chancellor, reversed.

### STATEMENT OF FACTS.

Appellee brought this suit in equity against appellants to enjoin them from levying and collecting drainage taxes and levee taxes upon his land.

Drainage District No. 7 of Poinsett County, Arkansas, was organized under a special act passed by the Legislature of 1917. The act organized a drainage and levee district in Poinsett County, Arkansas, consisting of certain lands, which are described in the act. The district was organized for the purpose of draining the lands described in its boundaries by a system of drainage ditches and levees and to enable said district to borrow money for the construction of said drainage ditches and levees. Acts of 1917, p. 1053. The district as originally formed consisted of lands west of the St. Francis River, in Poinsett County.

Roy Rice and others owned lands in Poinsett County east of the St. Francis River, comprising, in the aggregate, 3,290 acres. Their lands were flooded by the waters of a drainage district organized in Mississippi County, and, in order to secure protection against the flood waters from the Mississippi County District and also to secure better drainage to their own lands, the landowners above mentioned in Poinsett County east of St. Francis River petitioned the county court to allow them to be added to Drainage District No. 7 of Poinsett County. On March 15, 1918, the petition for the annexation of the territory east of St. Francis River in Poinsett County was acted upon by the county court, and the order of annexation was made. The order provides that there be levied against the lands annexed taxes in accordance with the benefits which said lands shall receive for the cost of draining, reclaiming and protecting the same. The board

of directors of the drainage district consented in open court to the annexation of the territory to the district. On May 24, 1919, the drainage district altered its plans so as to provide for the drainage of the territory of the original district. This judgment recites the annexation of said lands and the confirmation of such annexation by act 35 of the General Assembly of Arkansas of 1919. See Special Acts of 1919, page 52.

On June 28, 1919, the county court entered a judgment making a modification of the assessments because of the change of plans. The judgment recites that the estimated cost of the entire improvement has been increased to $3,392,000. On June 23, 1919, the county court confirmed the assessment made upon the lands annexed as well as the assessment upon all the other lands in the district. Nearly all the lands owned in the annexation to the district, including the land of appellee, belonged to the United States at the time the original district was organized in 1917. Practically all of the landowners in the annexation to the district had received their final certificates of entry prior to the 23d day of June, 1919, and all of them received their final certificates of entry or their patents during the year 1919.

On April 5, 1922, the board of directors filed a report in the county court that the assessment of benefits had become unequal, and offered a complete reassessment of benefits upon all the lands in the district, including the annexed lands. On May 31, 1922, the county court entered an order establishing a readjustment of the assessment of benefits.

St. Francis Levee District was organized under an act of the Legislature of 1893. The act, as originally passed, was for the purpose of establishing that part of the St. Francis River basin lying within the State of Arkansas into a levee district. Acts of 1893, p. 24. The powers of the St. Francis Levee District are contained in that act and in the subsequent acts of the Legislature supplementary and amendatory thereto. All the land in controversy was situated within the boundaries of the

St. Francis Levee District as fixed by the original act creating it. ·Other facts will be stated or referred to in the opinion.

The chancellor found the issues in favor of appellee, and it was decreed that the Drainage District No. 7, Poinsett County, Arkansas, and the St. Francis Levee District be enjoined from attempting to make an assessment of benefits or from the enforcement of any assessment of benefits on the lands of appellee within such drainage district and levee district. To reverse that decree an appeal has been duly prosecuted to this court.

*Chas. D. Frierson* and *Mann & McCulloch,* for appellant.

*Cooley, Adams & Fuhr, D. F. Taylor* and *J. A. Tellier, amici curiae,* on behalf of appellee.

HART, C. J., (after stating the facts). The decree of the chancellor was based upon a holding that the facts in the case at bar bring it within the principles of law decided in *Lee* v. *Osceola & Little River Road Improvement District No. 1 of Mississippi County, Arkansas,* 268· U. S. 647, 45 S. Ct. 620, 69 L. ed. 1133, in which it was held that a State cannot impose special taxes on lands acquired by private owners from the United States on account of benefits resulting from a road improvement made before the United States parted with its title.

It is earnestly insisted by counsel for appellants that appellee is estopped by his conduct from questioning the validity of the annexation proceedings under which his property was placed in Drainage District No. 7 of Poinsett County and an assessment of benefits made against it. On the other hand it is claimed that, under the principles laid down by the Supreme Court of the United States in the Lee case, the doctrine of estoppel can have no application, because the land of appellee belonged to the United States at the time the petition for the annexation proceedings was signed by appellee and other landowners similarly situated.

We do not think that the Lee case is decisive of this question. In that case the road improvement district

was formed under the general statutes of the State providing for the establishment of road improvement districts, and the lands were what are known as lake lands or sunk lands, just as the lands involved in the present appeal are known. These lands, however, were included in the organization of the district, and benefits were assessed against them as land of riparian owners. Subsequently the land was adjudged to belong to the United States, and the title passed from the United States to private landowners. The improvement was completed at the time the title to the land was in the United States, and the United States did not grant the improvement district any authority to assess benefits against lands owned by the United States. Neither did the claimants of the land do anything that could be said to have been a participation in the formation of the district or the construction of the improvement. Hence there was no element of estoppel in that case.

In *Wight* v. *Davidson,* 181 U. S. 371, 21 S. Ct. 616, 45 L. ed. 900, it was held that a constitutional right against unjust taxation is given for the protection of private property, but that it may be waived by those affected who consent to such action to their property as would otherwise be invalid. This principle was recognized by the Supreme Court of the United States in the Lee case, but the effect of the opinion is that there was no element of estoppel under the facts of that case.

The case of *Nevada National Bank* v. *Poso Irrigation District,* 140 Cal. 344-347, 73 P. 1056, is cited in support of the holding of the United States Supreme Court. In the California case it was said that, if the grantee of the United States must take the land burdened with the liability of an irrigation district made to include it, without the consent of the government or the purchaser, it attaches a condition to the disposal of the property by the government without its acceptance or consent, and which must in such case interfere with its disposal.

We think the Lee case, then, expressly recognizes that the doctrine of estoppel may be invoked in a proper

case like the one under consideration; but it could not be applied under the facts of that case, because there had been no assent to the imposition of the taxes by the United States or by its grantee.

It is not claimed that the United States assented to the imposition of the special taxes in the present case, but it is claimed that, after appellee became the beneficial owner of the land, he was guilty of such acts and conduct as would estop him from attacking the validity of the annexation proceedings and the subsequent assessment of his lands thereunder. It is true that appellee and others filed a petition in 1918 for the annexation of their lands to the drainage district, but the change of plans was not made and the assessment of benefits was not made until June, 1919, at which time appellee and the other landowners who petitioned for the annexation had received final certificates of entry from the United States. When the certificate of entry was issued to appellee, he acquired the equitable title to the land, and the legal title alone remained in the United States. The land, in effect, thus no longer belonged to the United States but to the purchaser. *Witherspoon* v. *Duncan,* 21 Ark. 240, affirmed in 4 Wall. (U. S.) 210, 18 L. ed. 339. In affirming the case, Mr. Justice Davis, speaking for the court, said:

"According to the well-known mode of proceeding at the land offices (established for the mutual convenience of buyer and seller), if the party is entitled by law to enter the land, the receiver gives him a certificate of entry reciting the facts, by means of which, in due time, he receives a patent. The contract of purchase is complete when the certificate of entry is executed and delivered, and thereafter the land ceases to be a part of the public domain. The government agrees to make proper conveyance as soon as it can, and in the meantime holds the naked legal fee in trust for the purchaser, who has the equitable title."

Continuing, the learned Justice said:

"That Congress has the entire control of the public lands, can dispose of them for money, or donate them

to individuals or classes of persons, cannot be questioned. If the law on the subject is complied with, and the entry conforms to it, it is difficult to see why the right to tax does not attach as well to the donation as to the cash entry. In either case, when the entry is made and certificate given, the particular land is segregated from the mass of public lands and becomes private property. In the one case the entry is complete when the money is paid; in the other when the required proofs are furnished. In neither can the patent be withheld if the original entry was lawful.

"The power to tax exists as soon as the ownership is changed, and this is effected when the entry is made on the terms and in the modes allowed by law. If this were not so, those who, through the bounty of Congress, get a title to the soil, without money, would enjoy higher privileges and be placed on a better footing than the great body of persons who, by the invitation of the government, purchase lands with money. Such a discrimination could never have been contemplated by Congress."

To the same effect see *Wisconsin Railroad Co.* v. *Price County*, 133 U. S. 496, 505, 10 S. Ct. 341, 33 L. ed. 687; and *Bothwell* v. *Bingham County*, 237 U. S. 642, 35 S. Ct. 702, 59 L. ed. 1157.

Pursuant to the annexation petition, the land of appellee and the land of others, comprising at least 3,290 acres, were annexed to the original drainage district and brought under the operation of the act creating it. The landowners voluntarily asked for the privilege of becoming subject to all its provisions. In effect they asked for the assessment of benefits on their land and that they should become subject to the provisions of the act just as the land contained in the original district. The commissioners of the drainage district assented to their request, and the county court acted upon it and changed the formation of the district and the improvements to be made thereunder in a substantial way. In the very nature of things the added district imposed a

very much larger expense upon the property owners of
the whole district in order to afford protection to the
lands of appellee and others who desired to be brought
under the provisions of the act creating the drainage
district and to participate in the benefits to be derived
therefrom. It was necessary to issue a very much larger
bonded indebtedness in order to accomplish this purpose.
The property owners in the original district assumed the
larger additional indebtedness, relying upon the acts and
conduct of the petitioners. By petitioning for the annex-
ation of their lands to the district, appellee and others
declared that they would submit themselves to all the
responsibilities and burdens imposed by the original act.
They purposely caused the authorities to believe this as
a matter of fact. Relying upon their acts and conduct,
the commissioners largely increased the bond issue and
expended money in the construction of the improvements
in the amended district so as to reclaim and protect the
lands of appellee and the other petitioners for the annex-
ation from the floods. They permitted their lands to be
assessed in June, 1919, after they had become the bene-
ficial owners of them. In 1922 the commissioners, under
the belief that the old assessments had become unequal,
made a complete reassessment of the benefits against all
the lands of the district, including those who had peti-
tioned for the assessment. They proceeded with the
work under the amended plans, and appellee and other
landowners similarly situated enjoyed the benefits. To
now permit them to deny the assurance given by their own
acts and conduct, which was continued during the prog-
ress of the work, would work a fraud upon the drainage
district and the landowners situated within its original
boundaries, and this cannot receive the sanction of law.
The drainage district and the commissioners thereof had
no reason to believe that the petitioners for the annex-
ation would allege any invalidity in the law which they
were asking to have extended for the protection of their
land. The drainage district and all interested under the
original act have been misled by the affirmative acts and

conduct of appellee and others petitioning for the annexation of their lands to the district.

Hence we are of the opinion that appellee and those similarly situated are estopped from attacking the validity of the annexation proceedings and the assessment of benefits against their land authorized for the construction of the drainage district and levees contemplated under the act. Having expressly consented to the taxation of their land after they had become the beneficial owners thereof, and the drainage district having acted thereon and made large expenditures in reliance upon their consent, such consent cannot be withdrawn.

There is, however, no element of estoppel in the case against the St. Francis Levee District; for appellee, neither by his declaration nor conduct, did anything to induce the board of directors of the St. Francis Levee District to act in relation to the inclusion of his land within such district and to make an assessment of benefits thereon. If his land and the lands of others similarly situated are in the district and have become subject to an assessment of benefits for levee purposes, this results from the operation of law and not from any act or conduct of appellee and other landowners similarly situated.

It is not claimed that there is an act of Congress allowing the lands in controversy to be assessed for levee purposes as are the other lands in the district. The St. Francis Levee District was created by the Legislature of 1893, and the powers of the board of levee directors are contained in that act and the acts supplementary and amendatory thereto. Section one of the original act provides that that part of the area of the St. Francis basin within the State of Arkansas is the territory included in the district. Acts of 1893, p. 24. The act contemplates an annual assessment of all the lands in the district subject to special assessment for levee purposes. The record shows that the action of the Mississippi River, which is on the eastern boundary line of the district, continually causes changes to be made in the improvement district. The channel of the river is continually shift-

ing, and, in flood time, large portions of the levee are
frequently destroyed and have to be replaced. The banks
of the river itself are continually changing, and every
overflow causes unexpected changes in the channel of
the river, in the banks, and in the levee.

The record shows that the plans for constructing the
levees are of necessity constantly being revised to meet
the changed conditions, and that the levee has not been
constructed up to the standard prescribed by the United
States. In short, the changed situations caused by the
flood waters make necessary a revision of construction
plans so that no part could be completed according to the
standard prescribed by the United States before it again
became necessary to revise the plans. Indeed, the court
will take judicial notice of the length, width and depth
of the Mississippi River and the encroachment of the
river upon the lands adjacent to it in times of flood. The
court will also take judicial notice of the vast area of
territory of the United States which is drained into the
Mississippi River, and the result of the action of the
river in flood times upon its banks and the levees along
the banks. When all the matters are considered, it is
perfectly evident that the levee in question has never
become a complete improvement within the meaning of
the Lee case. To so hold would place a too limited or
restricted meaning upon the word "complete." The
expression "completed improvement" is a relative term,
and its meaning depends upon the connection in which
it is used when read in the light of the object to which it
refers. It was intended by the framers of the St. Francis
Levee act and the acts amendatory thereto that all lands
within the boundaries of the district should fall under the
provisions of the act as soon as they come to be privately
owned. There has been no act of Congress allowing the
lands of the United States upon which no final certificate
has been issued to become subject to special assessments
for levee taxes, as was the case in *Pierce* v. *Drainage District No. 17*, 155 Ark. 89, 244 S. W. 342. Hence as long
as the lands now owned by appellee belonged to the

United States they were not subject to special assessment for levee purposes under the doctrine of the Lee case. When the final certificate was issued, however, the naked legal title only remained in the United States and the equitable title was in the grantee. The lands fell, by operation of law, within the provisions of the act creating the St. Francis Levee District, and were subject thereafter to the annual assessments of levee taxes just as were all the other privately owned lands in the district.

The flood waters of the Mississippi River come down with resistless force, and the consequent changes in its channel and the resultant encroachment on its levees make their construction and maintenance a continuing project, which, in the very nature of things, can never be completed.

The result of our views is that the decree of the chancery court will be reversed, and the cause will be remanded with directions to dismiss the complaint for want of equity. It is so ordered.