Decided 12 August; rehearing denied 25 November, 1901.

## ALTSCHUL *v.* CLARK.

[65 Pac. 991.]

ADVERSE POSSESSION—PUBLIC LANDS—GOVERNMENT TITLE.

1. The entry upon and continued occupation of land, followed by an attempt to obtain title thereto through the land department of the general government, is an admission that the title is in the United States, and such settler will not afterwards be permitted to claim against the holder of the government title that the proceedings before the land department were not a recognition of the original title: *Altschul* v. *O'Neill*, 35 Or. 202, applied.

LIMITATIONS—ROAD GRANT—APPROVAL BY SECRETARY OF INTERIOR.

2. Under Act of Cong. July 5, 1866, (14 Stat. 89, c. 174,) granting to Oregon to aid in the construction of a military wagon road certain sections of land to be selected from the public domain, and Act, Cong. June 18, 1874, (18 Stat. 80, c. 305,) providing for the issuance of patents for such lands to the state or its grantee, and Rev. Stat. §§ 441, 453, and 2478 in reference to the duties of the secretary of the interior and the commissioner of the general land office, the title to the lands selected under the grant did not pass from the government until the selection was approved by the secretary of the interior; and the statute of limitations did not begin to run against the state or its successors in interest, until such selection had been officially approved by the secretary.

From Harney; MORTON D. CLIFFORD, Judge.

This is an action by Charles Altschul against Emmett Clark to recover possession of the southeast quarter of the southeast quarter, and lots 5 and 6 of section 23, township 22 south, range 30 east, Willamette Meridian. It is stipulated by the parties hereto that the plaintiff holds the record title, and that adverse possession for the period of more than ten years prior to the commencement of this action is the sole defense interposed. By further stipulation it appears that the plaintiff has succeeded to whatever rights or interest the Willamette Valley & Cascade Mountain Wagon Road Company acquired through the acts of congress of July 5, 1866, and June 18, 1874, and the act of the Legislative Assembly of the State of Oregon of October 24, 1866; that the lands involved were surveyed January 28, 1884, and the plat thereof filed in the local land office May 26 following, and that they were withdrawn from sale and settlement

August 6, 1874; that on July 17, 1884, the company presented to the register and receiver of the local land office a selection list embracing the forty-acre tract, tendering with it the regular and customary fees, which were rejected; that on January 26, 1899, the company again presented for filing and approval its list embracing the same land, which was thereupon filed and approved; that on July 17, 1884, the company presented a selection list, separate from the one above alluded to, comprising lots 5 and 6, to the register and receiver of the local land office for filing, tendering the fees therewith, which was filed and approved, but that thereafter, in the year 1887, the selection of said lots was disallowed and rejected by the commissioner of the general land office, and was never at any time prior to 1893 approved by such commissioner, the secretary of the interior, or other officer of the general government, save the register and receiver; that on June 11, 1884, Elonzo N. Fleming filed a preemption declaratory statement for said forty-acre tract, and on May 9, 1887, transmuted said filing to a homestead entry; that on June 3, 1891, he submitted final proof, and the matter was suspended by the register and receiver, who decided that the entry was in conflict with the grant of the road company, from which decision he prosecuted an appeal to the commissioner of the general land office, and thence to the secretary of the interior, which resulted in the matter being remanded to the commissioner to be disposed of in accordance with directions. Thereupon the commissioner found that the tract had never been selected by the company, and sustained Fleming's entry, whereupon the company took an appeal, which culminated in the cancellation of the entry on February 9, 1899. No attempt has ever been made by the defendant or his predecessors to acquire title from the government to lots 5 and 6.

The defendant is the grantee of Fleming, and his ad-
verse possession, if effective as a defense, was initiated in
1883, and has been continuous in Fleming and the defend-
ant ever since. Fleming testified that he made the home-
stead filing in 1886; that he did not know who held the
paper or legal title to the land at the time; that his pur-
pose in filing was "to ascertain whether the government
had any right or not;" that he did not intend, by any-
thing he did with respect to such filing, to recognize title
in the United States. On cross-examination he says that
he went to the expense of litigating in the land depart-
ment because he had no other means of acquiring the
government's right, if it had any; that he did not know
whether it had any right therein or not; that he expected
to get title, if he did not get it from the government, by
holding it as a home. At the conclusion of the trial the
plaintiff requested the court to instruct the jury to return
a verdict in his favor. This was refused, and the court
gave the following, among other instructions: "I charge
you that the filing by the road company, in the proper
local land office, of the selection list including the lands
in controversy, and the payment or tender of payment of
the fees required by the government therefor, operated to
then and there pass title [to the lands selected] to the road
company;" and, further, in effect, that if Fleming filed
his homestead application with the intention of recogniz-
ing the title as being in the United States or plaintiff's
predecessor in interest,— that is, if the jury believed
from the evidence that such was his intention in making
such filing,—then that the defendant was not entitled to
prevail; but if, on the other hand, such was not his in-
tention,—which was a question of fact for their determin-
ation,—and he and the defendant have since held adverse
possession for a period of ten years, then that this verdict

should be for the defendant.  Exceptions were duly saved, and, the verdict and judgment being for defendant, plaintiff appeals.                           REVERSED.

For appellant there was a brief over the name of *Williams, Wood & Linthicum*, with an oral argument by *Mr. Stewart B. Linthicum*.

For respondent there was a brief over the names of *King & Saxton*, and *Lionel R. Webster*, with an oral argument by *Mr. Webster* and *Mr. Will R. King*.

MR. JUSTICE WOLVERTON delivered the opinion.

1.    It was decided by this court in *Altschul* v. *O'Neill*, 35 Or. 202 (58 Pac. 95), that adverse possession, such as will set in motion the statute of limitations, could not be set up against one deraigning title from the general government while the occupant asserted, admitted, or recognized that the true or ultimate title was yet in the government. It was broadly urged there; as here, that the claim of right or ownership and adverse holding need only be against the true owner, and that the occupant may make such claim, and at the same time concede that title exists in the government; or, to put it in another form, that the claim of right is sufficient if against all persons except the United States.   Speaking upon the facts of the case, we said, at page 222 : " The admission of title in the government, to which the plaintiff succeeded, is tantamount to an admission of plaintiff's title, as it was the only true one in the premises.   In this connection Judge Ross' declaration in *Lord* v. *Sawyer*, 57 Cal. 65, is apropos :  ' Such a holding may, nevertheless, be adverse to every one not holding under the government.'   The converse is equally true,— that it would not be adverse to one holding under the government.   If the defendant's

possession had continued unexplained for the statutory period, he would, perhaps, have been entitled to the presumption that it was adverse. But the tendency of the testimony and the instruction of the court implies evidence of admission or an assertion that he was not claiming the fee, but a possessory right only, such as would entitle him to a homestead entry, and none other ; and this of itself is sufficient to explain the manner of his holding, and that it never became adverse to the plaintiff.'' To that doctrine we still adhere. But the question is here presented in a somewhat different form. The defendant's predecessor says that when he filed his pre-emption, and subsequently commuted it into a homestead, and prosecuted the matter to a final determination through the land department, he did not know what title the general government had, and was seeking thereby to obtain only such title as it had, if it had any, and did not intend to recognize that it had any right or title whatever. And the court instructed that, if he did not intend thereby to recognize the title as being in the United States, and held adversely, the plaintiff was not entitled to recover. Thus is presented the question whether a party may prosecute a claim for pre-emption or homestead, carrying it through the different tribunals of the land department of the general government without success, and at the same time be permitted to say that he was endeavoring to obtain only such title as the government had, and did not thereby intend to recognize that it was possessed of the true title. The mere statement of the proposition is sufficient to refute it as unwholesome doctrine. But let us pursue the inquiry.

It is well known that the government is the original source of all titles to realty ; that, being the owner primarily, it adopted a policy of disposing of the public domain to those desiring to acquire homes and become

freeholders.   But, for the purpose of an orderly admin-
istration thereof, it adopted, as it had the right and
authority to do, certain rules and regulations, and pro-
vided appropriate tribunals, for the determination of con-
flicting rights inaugurated under the system, whereby
the title may be acquired.   In furtherance of its policy,
and as a means of disposal, the laws relating to pre-emp-
tion and homesteads were enacted.   To inaugurate a
valid pre-emption right thereunder, the claimant must
make a settlement in person on public lands subject to pre-
emption (Section 2259, Rev. Stat. U. S.), and the rules of
the department require that he make a declaratory state-
ment of the fact that it is his intention to claim the tract
of land selected for a pre-emption right, which must be
accompanied by an affidavit showing that he settled upon
and improved the land in good faith to appropriate it to
his own use, and that he has not made any agreement or
contract whereby the title he might acquire from the gov-
ernment should inure in any degree to any one except
himself :   Circular, General Land Office, ''Title to Public
Lands,'' (issued July 11, 1899,) Forms 4-534, 4-061,
pp. 272, 273.   As the law stood at the time Fleming
made his homestead application, he was entitled to enter
and acquire a quarter section or less quantity of unappro-
priated lands :   Section 2289, Rev. Stat.U. S.   And he was
authorized to commute his pre-emption into a homestead,
which entitled him to the benefit of the time of his resi-
dence under the pre-emption to be applied towards the
homestead.   Under said section 2289, the homesteader
is required to make application to enter the lands desired,
describing them, and by section 2290, and the rules of
the department, to accompany it with an affidavit that
he has honestly and in good faith made, for the purpose
of actual settlement and cultivation, such application ;
that he has not, directly or indirectly, made any contract

or agreement by which the title he may thereby acquire from the government should inure to the benefit of any one except himself, and that he has not heretofore had the benefit of the homestead laws. He is required to give notice of his intention to make final proof, and must make such proof in order to establish his claim to the land ; and by his final affidavit he must aver that he is the sole and bona fide owner as an actual settler : Circular, General Land Office, "Title to Public Lands," Forms 4-007, 4-063, 4-348, and 4-070, pp. 274, 275, and 278. His final proof must, of course, show a compliance with the laws, or otherwise he will fail.

Now, it is not possible that a pre-emption claimant, who has transmuted his pre-emption into a homestead entry, and pursued the matter to a final hearing up to the secretary of the interior, can have taken all the steps required by law and the rules and regulations of the department without an admission or recognition of title in the government. The very initiation and prosecution of the proceeding under the laws of congress and the rules and regulations provided for acquiring public lands is in itself an assertion that the land sought belongs to the public domain, that the government has the ultimate title, and that it is from that source the claimant expects to secure it. It is not a claim of title in himself, but of a right under the laws of congress, whereby he may eventually obtain the ultimate title, which he asserts and recognizes, by the proceeding he has inaugurated and prosecuted, to be in the general government. The claim thus made is so palpably at cross-purposes with a claim of present right of ownership or title in the pre-emptioner or homesteader that both can not well subsist as a valid initiatory right to the acquirement of the ultimate title at one and the same time. We are impelled to the con-

39 OR.— 21.

clusion, therefore, that Fleming, by his pre-emption entry, his conversion of the same into a homestead entry, and the prosecution of his claim as a homestead entryman through the several tribunals provided by the land department, until he was eventually defeated on appeal to the secretary of the interior, precludes him and the defendant from now asserting that he was in the mean while claiming ownership and title in himself. The question, therefore, whether he did or not during the time intend to recognize title as being in the United States, should not have been submitted to the jury. These considerations have application to the forty-acre tract only, and do not affect lots 5 and 6.

2. This brings us to the question whether the selection by the road company, and the filing of the selection list in the local land office, comprising the land in controversy, and the payment or tender of the usual fees, operated to pass title out of the government to the road company. It has a bearing upon both parcels, and the result will affect them alike. The act of congress of July 5, 1866, (14 Stat. 89, c. 174), declares : '' That there be, and hereby is, granted to the State of Oregon, to aid in the construction of a military wagon road from Albany, Oregon, by way of Canyon City, and the most feasible pass in the Cascade range of mountains, to the eastern boundary of the state alternate sections of public lands, designated by odd numbers, three sections per mile, to be selected within six miles of said road ;'' and it is further provided ''that any and all land heretofore reserved to the United States by act of congress or other competent authority are reserved from the operation of the act, except so far as it may be necessary to locate the route of said road through the same, in which case a right of way is granted, subject to the approval of the president of the

United States." Section 4 provides that the lands thereby granted shall be disposed of only as sections of ten miles of the road are completed, and the governor of the state has certified the fact to the secretary of the interior. This act was amended July 15, 1870 (16 Stat. 363, c. 297), by requiring the road to be constructed by way of Camp Harney, instead of Canyon City. By an act of the legislative assembly of the state approved October 24, 1866, the state granted its interest in said grant to the Willamette Valley & Cascade Mountain Wagon Road Company. On June 18, 1874, congress passed an act relative to military wagon road grants to the State of Oregon (18 Stat. 80, c. 305), which, including the preamble, reads as follows : " Whereas certain lands have heretofore, by act of congress, been granted to the State of Oregon to aid in the construction of certain military wagon roads in said state, and there exists no law providing for the issuing of formal patents to said lands : Therefore, be it enacted," etc., "that in all cases when the roads in aid of construction of which said lands were granted are shown by the certificate of the governor of the State of Oregon, as in said acts provided, to have been constructed and completed, patents for said lands shall issue in due form to the State of Oregon as fast as the same shall, under said grants, be selected and certified, unless the State of Oregon shall by public act have transferred its interests in said lands to any corporation or corporations, in which case the patents shall issue from the general land office to such corporation or corporations upon their payment of the necessary expenses thereof."

Now, it is contended on the part of the defendant that the act of July 5, 1866, constitutes a present grant of land, which took effect as selections were made by relation as of the date of the act, and that no approval by the land department was necessary or required as a con-

dition precedent to the passing of the title. Hence it is asserted that when the selection lists of the company, comprising these particular parcels of land, were presented to the officers of the local land office, accompanied by a tender of the required fees, the title became absolute, and that the patents therefor are only evidence of the title which passed by the terms of the grant. There is a marked dissimilarity between the act in question and other land grant acts that have received judicial construction. Cases are cited where the selections were to be made by the grantee, subject to the approval of the secretary of the interior, or under his direction ; and as to such it has been uniformly held that the title did not pass without his approval : *St. Paul & S. C. R. Co.* v. *Winona & St. P. R. Co.* 112 U. S. 720 (5 Sup. Ct. 334); *Winona & St. P. R. Co.* v. *Barney*, 113 U. S. 618 (5 Sup. Ct. 606); *Sioux City & St. P. R. Co.* v. *Chicago, M. & St. P. R. Co.* 117 U. S. 406 (6 Sup. Ct. 790); *Wisconsin Cent. R. Co.* v. *Price County*, 133 U. S. 496 (10 Sup. Ct. 341); *Ryan* v. *Railroad Co.* 99 U. S. 382 ; *Davis* v. *Capital Phos. Co.* 6 C. C. A. 278 (57 Fed. 118). It is said in *Barney* v. *Winona & St. P. R. Co.* 117 U. S. 228, 232 (6 Sup. Ct. 654, 656), that '' In the construction of land grants in aid of railroads there is a well-established distinction observed between 'granted lands' and 'indemnity lands.' The former are those falling within the limits specially designated, and the title to which attaches when the lands are located by an approved and accepted survey of the line of the road filed in the land department as of the date of the act of congress. The latter are those lands selected in lieu of parcels lost by previous disposition or reservation for other purposes, and the title to which accrues only from the time of their selection.'' It should be noted that the grant involved in that case expressly required an approval by the secretary of the inte-

rior.   The distinction is well illustrated in *Wisconsin Cent. R. Co.* v. *Price County*, 133 U. S. 496 (10 Sup. Ct. 341), wherein it was held that a grant of every alternate section of public lands designated by odd numbers for ten sections in width on each side of the road was a grant in place, and took effect when the route of the road had been permanently located by relation as of the date of the act.   But, as to the land to be selected from the public domain in alternate sections nearest to the tier of sections thus specified in lieu of the land that had been previously disposed of, it was declared to be a grant in quantity, and that, until selections were made in the manner prescribed, — which in that act expressly required the approval of the secretary of the interior,— no title vested.

The grant under consideration manifestly does not fall within the category of a grant in place, as the definite or permanent location of the route of the road did not serve to identify the particular lands affected by it.   Being of three odd sections out of six along the line of the road, a permanent location was not sufficient by itself to identify the particular odd sections to which the grant should apply.   So it was provided that there should be a selection, and this determines the character of the grant as one of quantity, and not in place ; and it has been so designated and treated by the land department. The Hon. L. Q. C. Lamar, Secretary of the Interior, says, in discussing the act, that it "was not a grant of lands in place, or of specific lands, but a grant of quantity, to be selected from odd-numbered sections within certain boundaries to be fixed and defined by construction of sections of the road of ten miles each " : *Rinehart* v. *Road Co.* 5 Land Dec. Dep. Int. 650.   The Hon. Hoke Smith says : "This is a grant of quantity, viz., three alternate sections per mile, to be selected within six miles of the road" : *In re Willamette Val. & Cas. Mount.*

*Wag. R. Co.* 18 Land Dec. Dep. Int. 25.   And see *Willamette Val. & Cas. Mount. Wag. R. Co.* v. *Bruner*, 22 Land Dec. Dep. Int. 654 ;   *In re Willamette Val. & Cas. Mount. Wag. R. Co.* 29 Land Dec. Dep. Int. 344.   The language of the act is that there be, and hereby is, granted alternate sections, "to be selected within six miles of the road."   By the interpretation of the land department, the selection is to be made by the state or its grantee, and it is not competent for the secretary of the interior to restrict the right to anything less than the entire grant, save only such lands as were excluded by the terms of the act :   *Willamette Val. & Cas. Mount. Wag. R. Co.* v. *Bruner*, 26 Land Dec. Dep. Int. 356 ;   *In re Willamette Val. & Cas. Mount. Wag. R. Co.* 29 Land Dec. Dept. Int. 344.

But, does the mere selection by the state or its grantee pass title, or does it require, in addition, the approval of the secretary of the interior, before the grant may be said to become absolute, as in cases where it is made necessary by express provision? After much research and deliberation, we have come to the conclusion that his approval is a necessary prerequisite, and that title does not pass without it.   The interior department has been intrusted, by appropriate legislation, with the supervision and the sale and disposal of the public domain.   By virtue of that power and authority, the land department has been organized, and a regular course of procedure prescribed, whereby the rights of purchasers and grantees may be ascertained and determined.   Laws relating to the disposal of public lands must be presumed to have been enacted with a view to their administration by and through this department ; and, if a grant is involved, that necessarily becomes a subject of its administration as well.   By Section 441, Rev. Stat. U. S. "the secretary of the interior is charged with the supervision of all public business relating to   *   *   *   the public land, includ-

ing mines." By section 453 it is provided: "The com-
missioner of the general land department shall perform,
under the direction of the secretary of the interior, all
executive duties appertaining to the surveying and sale
of the public lands of the United States, or in anywise
respecting such public lands, and, also, such as relate to
private claims of land, and the issuing of patents for all
agents [grants] of land under the authority of the govern-
ment;" and by section 2478: "The commissioner of the
general land office, under the direction of the secretary
of the interior, is authorized to enforce and carry into
execution, by appropriate regulations, every part of the
provisions of this title [relating to public lands] not other-
wise specially provided for." Construing these statutes,
Mr. Justice LAMAR says, in *Knight* v. *United States Land
Assoc.* 142 U. S. 161 (12 Sup. Ct. 258): "The phrase,
'under the direction of the secretary of the interior,' as
used in these sections of the statute, is not meaningless,
but was intended as an expression, in general terms, of
the power of the secretary to supervise and control the
extensive operations of the land department, of which
he is the head. It means that in the important matters
relating to the sale and disposition of the public domain,
the surveying of private land claims, and the issuing of
patents thereon, and the administration of the trusts
devolving upon the government by reason of the law of
congress or under treaty stipulations respecting the pub-
lic domain, the secretary of the interior is the supervising
agent of the government, to do justice to all claimants,
and preserve the rights of the people of the United States."
And, quoting from his ruling while secretary of the inte-
rior, *In re Pueblo City of San Francisco*, 5 Land Dec. Dep.
Int. 494, he continues: "The statutes, in placing the
whole business of the department under the supervision
of the secretary, invests him with the authority to review,

reverse, amend, annul, or affirm all proceedings in the department having for their ultimate object to secure the alienation of any portion of public lands, or the adjustment of private claims of lands, with a just regard to the rights of the public and private parties. Such supervision may be exercised by direct orders or by review on appeals. The mode in which the supervision shall be exercised in the absence of statutory direction may be prescribed by such rules and regulations as the secretary may adopt. When proceedings affecting titles to lands are before the department, the power of supervision may be exercised by the secretary whether or not these proceedings are called to his attention by formal notice or by appeal. It is sufficient that they are brought to his notice. The rules prescribed are designed to facilitate the department in the dispatch of business, not to defeat the supervision of the secretary.''

So, it was said in *Williams* v. *United States*, 138 U. S. 514, 524 (11 Sup. Ct. 457, 461): ''It is obvious—it is common knowledge—that in the administration of such large and varied interests as are intrusted to the land department, matters not foreseen, equities not anticipated, and which are therefore not provided for by express statute, may sometimes arise, and therefore that the secretary of the interior is given the superintending and supervising power which will enable him, in the face of these unexpected contingencies, to do justice.'' And again, in *Steel* v. *St. Louis Smelt. Co.* 106 U. S. 447 (1 Sup. Ct. 389), Mr. Justice FIELD says: ''That department, as we have repeatedly said, was established to supervise the various proceedings whereby a conveyance of the title from the United States to portions of the public domain is obtained, and to see that the requirements of different acts of congress are fully complied with.'' For later expressions of the federal supreme

court to the same purpose, see *Michigan Land & Lum. Co.* v. *Rust*, 168 U. S. 589 (18 Sup. Ct. 208), and cases there cited. With this ample power in the secretary of the interior, it is not supposable that congress intended to pass title by the grant upon the mere selection by the grantee without appropriate supervision thereof by that functionary. There are matters of importance for him to pass upon before it can be said that in the discharge of the duties imposed upon him by the general statutes he has duly and fully administered the grant. He must see that selections are within the limits of the grant, that they are not lands previously disposed of, and that they do not exceed the quantity granted ; and, unless he has done this, and approved the selection, the grant has not been duly administered, and no title can pass. This seems to be the interpretation placed upon the grant by congress in adopting the act of June 18, 1874. It requires that patents for said lands shall issue to the State of Oregon or its grantees as fast as the same shall, under said grant, be selected and certified. While it was not intended thereby to ingraft upon the original act a condition that the patents should issue as a prerequisite to the passing of the title, it indicates quite clearly that the primary intention of congress was that the selection should receive the certification—or, in other words, the approval — of the secretary of the interior, before the grant should become effective. This seems also to have been the practice of the department touching these very lands. The secretary of the interior, writing to the commissioner of the general land office of date January 5, 1894, relating to five lists of land numbered 4, 5, 6, 7, and 8, aggregating one hundred and sixty-one thousand two hundred and seventy-four and forty-two hundredths acres, which he had sent up with a recommendation that they be approved, says : "I have, therefore, approved

the lists submitted, which are herewith returned, as the basis of patents to be issued to the company.   \*   \*   \* As to the lands covered by pending selections which are in conflict with adverse claims, I reserve decision, leaving the matter to be determined according to the facts in each individual case." *In re Willamette Val. & Cas. Mount. Wag. R. Co.* 18 Land Dec. Dept. Int. 25. We are not, however, without judicial authority to the same purpose. Judge BELLINGER, of the United States District Court for the District of Oregon, in *Altschul* v. *Gittings* (C. C.), 102 Fed. 36, 38,—a case involving this grant,—says : "The approval and certification of the lands by the land department is a necessary preliminary to the identification of the lands taken. Without identification, the grant can not attach ; and, until it does attach, there is no title that can be subject of levy and sale for taxes or otherwise." As to the forty-acre tract, there was, by stipulation, no approval by the secretary of the interior earlier than June 25, 1899, and, as to lots 5 and 6, before 1893 ; so that the title could not have passed at an earlier period. It being conceded that the statute of limitations does not run while title is in the government, it is apparent that it has not since run as to either of these parcels ; hence the court should have instructed a verdict for the plaintiff, as requested. The judgment will be reversed, and the cause remanded for such further proceedings as may seem proper, not inconsistent with this opinion.       REVERSED.