CLEARWATER TIMBER CO. v. SHOSHONE COUNTY, IDAHO, et al.

(Circuit Court, D. Idaho, N. D. June 29, 1907.)

No. 363.

1. TAXATION—PUBLIC LANDS SELECTED IN LIEU OF FOREST RESERVE LANDS—PASSING OF EQUITABLE TITLE.

Under the several acts relating to forest reservations which permit private owners of lands therein to transfer or relinquish the same to the government and to select other public lands in lieu thereof, no exchange is effected until approved by the Land Department. The act of March 2, 1899 (30 Stat. 993, c. 377), establishing the Mt. Rainier National Park, expressly provides for the approval of the Secretary of the Interior, but the general act of June 4, 1897 (30 Stat. 34, c. 2 [U. S. Comp. St. 1901, p. 1538]), contains no such express provision, and the approval may be made by the Commissioner of the General Land Office under paragraph 18 of the rules adopted by the department thereunder. In either case, it is contemplated that the department shall, through proper officers, consider all questions of law and fact affecting the title and validity of the conveyance of the base lands, and the character and condition of the lieu lands selected, and, until that has been done and a formal approval given, the equitable title to the lands selected does not pass from the government,

nor does the applicant acquire any right of possession thereto, and they are not subject to taxation, especially in view of the fact that the department requires the applicant to pay all taxes levied on the base lands up to the time the exchange is approved.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Taxation, §§ 31, 35, 38-44.

Of equitable title to public lands, see note to Northern Pac. R. Co. v. Wright, 4 C. C. A. 196.]

2. SAME—EFFECT OF DEED TO PUBLIC LANDS.

A railroad company which owned patented lands within national forest reserves conveyed the same to the United States, and selected other public lands in lieu thereof, as permitted by statute. Thereafter it executed a deed to the lands so selected to complainant, but several years elapsed before such selections were approved by the Land Department and before the lands were even surveyed. *Held*, that the fact of its conveyance gave the county no right to tax such lands in the meantime while they remained unsurveyed public lands of the United States.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Taxation, §§ 40, 41.]

3. SAME—SUIT TO ENJOIN COLLECTION OF TAXES.

That a complainant was not the owner of lands at the time of an illegal levy of taxes thereon does not deprive it of the right to maintain a suit in equity to enjoin the enforcement of such taxes by a sale of the lands after it has become the owner.

4. SAME—PLEADING—WAIVER OF DEFECT IN ALLEGATIONS.

A complainant is not debarred from maintaining a suit to enjoin the enforcement of taxes illegally levied upon lands because its bill did not allege it to be the owner of such lands where no objection was taken to the pleading, and the proofs, taken by stipulation, establish its ownership.

5. SAME—PROPERTY SUBJECT TO TAXATION—UNSURVEYED LANDS.

Lands which have not been officially surveyed by the United States are not as a rule taxable, nor are they under the statutes of Idaho, and such a survey is not completed until it has been accepted by the Land Department.

In Equity.

James E. Babb and Stiles W. Burr, for complainant.

Walter H. Hanson, for defendants.

DIETRICH, District Judge. This suit was brought to vacate and annul certain assessments and tax sales of real property claimed by the complainant. The bill was filed January 9, 1906. The territory embracing said lands was formerly situated within the limits of Shoshone county, but afterwards, as a result of the election of 1904, the same became annexed to Nez Perce county, pursuant to an act of the Legislature of Idaho passed in the year 1904. The assessments in question were made in the years 1903 and 1904, and, the taxes thus assessed not having been paid by the plaintiff, sales for delinquency were made in the years 1904 and 1905, and certificates of such sales were issued to Shoshone county, the purchaser.

In its bill the plaintiff sets forth, in substance, the following facts: It is a corporation organized under the laws of the State of Washington, and it has complied with the laws of the state of Idaho relative to foreign corporations doing business in the latter state. It is the owner and entitled to the immediate possession of certain tracts and

parcels of land formerly situated in Shoshone county, but now situated in Nez Perce county, state of Idaho, which lands are described in different groups, the first group aggregating 16,565.76 acres, a second group aggregating 2,560 acres, a third group containing 3,523.20 acres, also a fourth group embracing 22,583.45 acres. It is alleged that all of these lands, at the dates of the assessments complained of, were vacant and unoccupied. The plaintiff is the grantee of the Northern Pacific Railway Company, which, in turn, is the successor in interest of the Northern Pacific Railroad Company, and, it is averred, all of these lands were selected by the Northern Pacific Railway Company in lieu of lands relinquished by it to the United States, the first group having been selected in lieu of lands so relinquished pursuant to an act of Congress approved March 2, 1899 (30 Stat. p. 993, c. 377), establishing the Mt. Rainier National Park, and the second group having been selected pursuant to the provisions of the general act approved June 4, 1897 (30 Stat. 34, c. 2 [U. S. Comp. St. 1901, p. 1538]), under which the Priest River Forest Reserve was established, and the third group having been selected pursuant to the provisions of said act of June 4, 1897, under which the Lewis and Clark Forest Reserve was established, and the fourth group having been selected in part under the provisions of said act of June 4, 1897, and in part under said act of March 2, 1899. All of said lands, it is averred, were selected by the Northern Pacific Railway Company during the years 1900 and 1901, while the same were unappropriated public lands of the United States, by the filing of selection lists in the United States District Land Office at Lewiston, Idaho. It is alleged that at the time of the selection the lands described in the first group were unsurveyed. It does not appear from the bill whether the lands described in the other three groups were surveyed or unsurveyed at the time the selection lists were filed. The selection lists so filed were transmitted to the office of the Commissioner of the General Land Office, and, it is averred, the lands therein described remained the property of the United States and a part of the public domain until the approval of said selections by the Secretary of the Interior and until the issuance of patents therefor, it being the duty of the officers of the Interior Department, before such selections were approved, to determine whether the lands specified in said lists, as the bases for the lands so selected, were situated within the limits of the Mt. Rainier National Park, the Priest River Forest Reserve, and the Lewis and Clark Reserve, respectively, and whether the same had been duly and properly conveyed to the United States in accordance with the provisions of said acts of Congress and whether the title to said base lands was, at the time of the conveyance thereof to the United States, vested in the Northern Pacific Railway Company, and whether the lands so selected were subject to selection under the provisions of said acts.

It is further averred, relative to the said first group of lands, that no determination of said questions of fact and no approval of said selections were made by the officers of the Department of the Interior until the 7th day of June, 1905, and that patent therefor was issued on the 12th day of June, 1905. And, as to the second group, it is averred

that the said questions of fact were determined in favor of the selector and the selection was approved April 21, 1905, and patent issued May 5, 1905. And, as to the third group, it is averred that the selection was not approved until May 2, 1905, and patent issued May 20, 1905. Thereafter, on the 12th day of September, 1905, by warranty deed, the Northern Pacific Railway Company conveyed all of the lands embraced in said three groups to the plaintiff. As to the status of the title of the fourth group, it is alleged that none of the selections or selection lists have ever been approved by the officers of the Department of the Interior, nor has any patent ever been issued. It is averred that all the lands embraced in said group are "the exclusive property of the United States and a part of the public domain of the United States"; that, if the selections of said lands so made by the Northern Pacific Railway Company are hereafter approved and patents issue therefor to the Northern Pacific Railway Company, "then your orator expects to acquire title to the same from the said Northern Pacific Railway Company," but it is averred that neither said railway company, nor the plaintiff, nor any other person, has any title, estate or interest, legal or equitable, in or to any of said lands.

After thus setting forth the history and status of the title to the various groups of land, the plaintiff proceeds to aver that in the year 1903 the officers of Shoshone county entered upon the assessment books of said county a description of all of said lands and assessed the same to the plaintiff, the taxes so assessed amounting to $7,882, and that all of said lands were valued and assessed and levied upon in one single parcel without division or apportionment. Thereafter, said taxes not having been paid and the same being delinquent, all of said lands were after advertisement offered for sale on July 12, 1904, in a single parcel, and were bid in by and struck off to the defendant, Shoshone county, for the sum of $8,607.45, and a tax certificate therefor was issued to the purchaser, and was made of public record in said county. Similar allegations are made relative to the assessment and sale of the same lands for the taxes of 1904. It is averred that the defendants claim and assert that no part of the land so sold can be redeemed from either of said sales, except upon the payment of the entire sum for which said lands were struck off to Shoshone county, together with interest, etc.

Thereupon follow a number of allegations relative to the interest claimed by Shoshone county and the interest claimed by Nez Perce county in said tax certificates, by reason of the segregation of the territory embracing these lands, from Shoshone county, and its annexation to Nez Perce county; also a number of allegations for the purpose of showing that the tax certificates, and the tax deeds which will follow in the course of time, will create a cloud upon the plaintiff's title to said lands. After service of subpœna, the defendants appeared and demurred to the bill, upon the ground that it did not state facts sufficient to entitle the complainant to the relief prayed for. This demurrer was on August 15, 1906, after argument, overruled by my predecessor, Hon. James H. Beatty. Thereafter the defendants answered, and to this answer the complainant filed a replication. The answer expressly admits substantially all of the allegations of the bill,

excepting those relating to the dates of the approval of the various selections referred to in the bill, and the averments involving mixed questions of law and fact as to the assessability of the lands in question during the years 1903 and 1904. The defendants deny that the Northern Pacific Railway Company, by deed, transferred the lands embraced in the first three groups described in the complaint on the 12th day of September, 1905, and, upon the other hand, they allege that the Northern Pacific Railway Company, by warranty deed, conveyed to the plaintiff all of the lands embraced in the four groups on the 30th day of July, 1901, which deed, it is alleged, was recorded in the office of the county recorder of Shoshone county, on page 13 of Book 20 of Deeds. Thereafter, on April 25, 1907, a written stipulation, signed by counsel for the respective parties, was filed, wherein it is agreed, in substance, that the facts as alleged in the bill of complaint are true, excepting only the allegations as to the date the selections were approved and patents were directed to be issued, and as to the dates determination was made of the questions of fact upon which the selections were based. There is also attached to the stipulation a copy of the instrument referred to in the answer as a deed from the Northern Pacific Railway Company to the plaintiff, dated July 30, 1901, and which was recorded in the office of the county recorder of Shoshone county on August 12, 1901. This instrument, after reciting that the railway company had contracted to sell and convey to the plaintiff the lands therein described, states that, in compliance with said contract, the railway company "does grant, bargain, and convey" to the plaintiff certain lands in Shoshone county, which are particularly described, and which aggregate 45,000 acres, and which are, with slight discrepancy, the same lands described in the bill of complaint. The railway company therein covenants that it, the railway company, "has not made, done, executed, or suffered any act or thing whatsoever" whereby the premises described are or shall be imperiled, charged, or incumbered, and the railway company further covenants to warrant and defend the title to said premises, "except as against any taxes and assessments levied or assessed against said land during the year 1901 and the years subsequent thereto, which the said party of the second part hereby assumes to pay." Thereafter, on May 24, 1907, by agreement of counsel for the respective parties, made in open court, an order was made that the cause be submitted on the pleadings, the stipulation referred to, divers depositions, and a large number of exhibits, most of which are transcripts of certain records and files of the United States Land Office at Lewiston, Idaho, and of the General Land Office at Washington. Practically all of this evidence relates to the history of the selection lists from the time they were filed until patents were issued, and to the official survey of the townships in which the lands in question are situated. There are also transcripts of the assessment books of the defendant county. All of the lands in question are situate in townships 38, 39, and 40 North, range 5 East, and townships 38, 39, and 40 North, range 6 East. The plats of these townships were certified by the Surveyor General of Idaho May 9, 1903, were accepted by the Commissioner of the General Land Office, Jan-

uary 15, 1904, and were filed in the local land office at Lewiston, Idaho, February 24, 1904. All of the selection lists covering the lands in question were filed prior to October 1, 1900, namely, at various dates in September, 1900. Thereafter, pursuant to the requirements of law and the regulations of the department, the railway company, in due time after said lands were surveyed and the plats thereof accepted and filed in the local land office at Lewiston, filed supplemental or amendatory lists, adjusting the original lists to the government surveys.

The record also discloses the fact that some protests were made or contests instituted and carried on against the claim of the railway company to certain of the lands selected; and also that examinations were made by examiners of the Interior Department for the purpose of determining whether or not the lands selected were vacant and unappropriated, and were, under the law, subject to approval and patent to the railway company, and whether or not the lands which the railway company offered to release could properly, under the law, be considered base lands, and whether or not the same were duly released by the proper parties in interest in accordance with law, and whether or not the lands selected were mineral in character, and other facts pertinent to the general question whether or not the railway company could of right select the lands described in the lists as lieu lands.

The exhibits, in much detail, set forth the various steps taken by the railway company and the officers of the Interior Department between the date of the filing of the original lists by the railway company and the date upon which patents finally issued, but, in my view, it is unnecessary particularly to set forth these details for the purpose of elucidating and applying the principles of law by which the rights of the parties hereto must be adjudged. The lands embraced in the first group described in the complaint, amounting to 16,565.76 acres, were, as heretofore stated, selected under the provisions of the act of March 2, 1899; also a considerable portion of the lands described in the fourth group were selected under the provisions of this act. This act provides that upon the execution and filing with the Secretary of the Interior by the Northern Pacific Railway Company of a proper deed releasing and conveying to the United States the lands which it rightfully claimed in the Mt. Rainier Forest Reserve, as created by said act, also in the Pacific Forest Reserve, whether the same were surveyed or unsurveyed, and which were situated opposite the railway company's constructed road, the railway company was authorized to select an equal quantity of nonmineral public lands to which no adverse right or claim had attached or had been initiated at the time of making the selection, such land lying within any state through which the railroad of said railroad company extended. The act further provides that in case the tract so selected should, at the time of the selection, be unsurveyed, the railroad company should, within three months after the lands were surveyed and the plats filed, file a new selection, describing the lands selected in accordance with the surveys. It is further provided that new descriptions might be given so as to make the selections conform to the surveys. It is further provided:

"That upon the filing by the said railroad company at the local land office of the land district in which any tract of land selected is situated and

the payment of the fees prescribed by law in analogous cases, and the approval of the Secretary of the Interior, he shall cause to be executed in due form of law, and delivered to said company, a patent of the United States conveying to it the lands so selected."

With regard to the first group of lands and selections under the provisions of this act, the proofs show a report made by examiners of the department May 3, 1905, upon certain questions, and on May 19, 1905, another examiner's report, to the effect that the tracts selected were not returned as mineral, and were not in conflict with any mining claim of record. And thereafter the Acting Commissioner of the General Land Office recommended to the Secretary of the Interior that the selections be approved, and that a patent be issued to the Northern Pacific Railway Company as the successor in interest to the Northern Pacific Railroad Company. On June 7, 1905, the selection was approved by the Secretary of the Interior, and patent issued June 12, 1905. Similar proceedings, as the proof shows, were taken relative to the lands embraced in the fourth group described in the complaint and selected under the provisions of this act; all the examinations and reports of the examiners being made in 1906, and the approvals by the Secretary of the Interior having been made and endorsed June 4, June 28, and August 28, 1906.

The other lands described in the complaint, namely, the second and third groups and a part of the fourth group, were selected under the provisions of the general act of June 4, 1897. The lists conveying these selections are No. 3,214, filed in the local land office September 28, 1900, for 9,065.72 acres, and No. 3,215, filed September 25, 1900, for 2,560 acres, and No. 3,216, filed the same day for 3,523.20 acres. As already indicated, all of the townships in which these lands are situated were at the time of the filing of these lists unsurveyed.

The rules of the department in force both at the time of tendering these lists, and at the time the plats of these townships were filed in the local land office, after the surveys had been accepted and approved, provided that the selections of unsurveyed lands must be made to conform to the survey within 30 days after notice from the local land office to the party making the selection of the receipt at the local land office of the approved plats, and, further, that no selections upon unsurveyed lands would be passed to patent until after four months following the filing of the plats in the local land office, in order that any person claiming an adverse right might thus have ample opportunity to file protest and otherwise to assert his claim to any of the land included in the selection lists. Complying with these rules, the railway company on March 21, 1904, filed in the local land office at Lewiston supplemental lists, adjusting lists 3,214, 3,215, 3,216 to the official surveys. The filing jackets in the General Land Office, covering these three selections, bear the following, among other indorsements: On jacket No. 3,214: "Approved by Commissioner June 12, 1903; approved for patent December 6, 1905." On jacket No. 3,215; "Approved by Commissioner October 16, 1902; approved for patent April 21, 1905." And on filing jacket No. 3,216: "Approved by Commissioner October 16, 1902; approved for patent May 2, 1905." The patent covering list No. 3,214 was issued December 21, 1905,

and patent covering list No. 3,215 was issued May 5, 1905, and patent covering list No. 3,216 was issued May 20, 1905. The record does not disclose the approval of any one of the three lists by the Secretary of the Interior. While it is not entirely clear from the record what was intended by the first approval of the Commissioner upon each one of the lists, it is obvious that, under the rules of the department and from the other indorsements and entries upon the filing jackets covering each list, such approval could not have been intended to be final and general in its nature, but it must have been confined to certain facts or features of the application. The record discloses the existence of contests and protests long after the first approval in each case, and the further fact that steps were being taken, during the period elapsing between the first approval and the final approval for patent, to determine and define the rights of the railway company. It also appears that on the filing of the supplemental lists, after the lands were surveyed, the original list No. 3,214 contained 88 acres in excess of the base lands. Accordingly, on March 21, 1905, the railway company tendered a deed for 80 acres, additional base lands, and $10 in cash to cover the remaining eight acres excess.

In further illustration of the fact that as late as 1905 the rights of the railway company to the lands described in lists 3,214, 3,215, and 3,216 were only inchoate, and that the exchange of the proffered base lands for the selected lieu lands had not been consummated, and that the offer of exchange by the railway company had not been accepted by the Interior Department, reference may be made to a letter of the Assistant Commissioner, dated September 11, 1905, advising the local officers at Lewiston, Idaho, that the appeal of William McBride, a claimant to some of the lands embraced in list 3,214, had been dismissed, and that "said decision, therefore, has become final, and the case is hereby closed." And, again, in a letter from the Assistant Commissioner to the local officers at Lewiston, dated February 8, 1905, the writer, referring to list 3,216, advises that the claim of James H. Estes to lands embraced in said list had been finally disposed of, and then says:

"Turning to said lieu selection 3,216 for final examination on its merits prior to patenting same, it is ascertained that the company neglected to furnish complete proof of nonliability for taxes and certificates as to freedom from federal judgments."

And in the same letter, after discussing the laws of Montana (in which state the base lands are situated) relative to taxes and the liens of taxes and judgments, the writer directs the local officers to "call, therefore, for one certificate covering above basis land, which will, if the facts warrant, serve to extend the above certificate to about the present time." And, as to judgments in the same letter the writer requires the selector—that is, the railway company—to "furnish certificates of clerks of said courts to the effect, if the facts warrant, that there are no judgments entered nor suits pending, as shown by the records of the respective courts, against any of the grantors (that is, the Northern Pacific Railroad Company and the Northern Pacific Railway Company) herein, that could operate as a lien on the lands

since July 19, 1899, when said lands were patented to the company." And the local officers were thereupon directed to serve upon the proper parties a copy of this letter. These are merely illustrations. Others might be given. But, in view of the status of the selections, as indicated by these illustrations, how can it be successfully contended that the right of the railway company became complete or that it had fully acquired the equitable title to the lands referred to in its original lists, until the lands had been surveyed, and the plats thereof had been approved or accepted by the proper representatives of the government, and the railway company had complied with the rules and regulations of the department by filing supplemental or adjustment lists, and also by complying with the requirements as to conveyance to the United States of the title to the base lands, free from liens and incumbrances? Suppose that the railway company, after having been served with a copy of the Assistant Commissioner's letter of February 8, 1905, above referred to, and relating to list No. 3,216, had failed or refused to comply with the requirements of the Commissioner as to furnishing certificates and abstracts, could it be asserted that the company could have compelled the acceptance by the government of the exchange which it had tendered by the filing of its selection lists? It is possible, but I do not decide, that if the officers of the department should arbitrarily and without reason neglect or refuse formally to approve the proffered exchange, the selector having done all that was required of him under the law and the rules and regulations of the department, and it appearing that the base lands and the lieu lands were of the character and in the condition contemplated by the law and regulations of the department entitling the selector to make the exchange, the right of the selector should be held to be complete, and that it should, for some purposes, be regarded as the equitable owner of the selected lands without the approval of the officers of the department. But it is not contended that such conditions existed in this case. There is no claim, and, indeed, there is no evidence in the record, that either the selector or the officers of the department carelessly or willfully delayed the final approval and patent of the selections. I have, therefore, concluded to hold that under the circumstances as disclosed by the record of this case the equitable title to the lands selected under the act of March 2, 1899, did not pass to the railway company until the selections were approved by the Secretary of the Interior, and that the equitable title to the lands selected under the act of June 4, 1897, did not pass to the railway company until the selections were approved for patent by the Commissioner of the General Land Office, and that the lands were not subject to taxation prior to approval.

That as a general rule approval of a proper officer is necessary seems to be conceded by counsel for the defendants, for in his brief he uses the following language:

"But it is true, and the defendants concede it to be well settled, that, where the act of Congress has granted to a railway company certain lands in lieu of lands which may have been previously entered, within the place limits, such lieu lands selected by the railway company are not subject to taxation until the selection is approved by the Interior Department."

Counsel supplements this statement by saying that he has been unable to find that in any case decided by the courts the tax was levied under a law similar to that obtaining in this state. But I do not think that, under the facts and circumstances disclosed by the record, the case can be taken out of the general rule by any peculiarities of the statutes of Idaho relative to the assessment of property and the collection of taxes thereon. Indeed, the Idaho statutes are not radically different from those found in many, if not most, of the western states. In Wisconsin Railroad Company v. Price County, 133 U. S. 496, 10 Sup. Ct. 341, 33 L. Ed. 687, there was involved the construction of a congressional act similar to the act of March 2, 1899. That action, like this, was brought by the railway company against the county to enjoin the collection of taxes levied upon lands selected by the company, the selection not having been approved by the Secretary of the Interior. Perhaps nowhere is there a more comprehensive, and at the same time more guarded, statement of the principles governing the taxability of lands, the legal title to which is in the United States, than that contained in this decision. After adverting to the familiar law that a state has not the power to tax the property of the United States within its limits, and that usually the possession of the legal title by the government determines both the fact and the right of ownership, Mr. Justice Field, who delivered the opinion of the court, speaks as follows:

"There is, however, an exception to this doctrine with respect to the public domain, which is as well settled as the doctrine itself, and that is that where Congress has prescribed the conditions upon which portions of that domain may be alienated, and provided that upon the performance of the conditions a patent of the United States shall issue to the donee or purchaser, and all such conditions are complied with, the land alienated being distinctly defined, it only remaining for the government to issue its patent, and until such issue holding the legal title in trust for him, who in the meantime is not excluded from the use of the property—in other words, when the government has ceased to hold any such right or interest in the property as to justify it in withholding a patent from the donee or purchaser, and it does not exclude him from the use of the property—then the donee or purchaser will be treated as the beneficial owner of the land, and the same be held subject to taxation as his property. This exception to the general doctrine is founded upon the principle that he who has the right to property, and is not excluded from its enjoyment, shall not be permitted to use the legal title of the government to avoid his just share of state taxation."

The grant in that case was to the state of Wisconsin, and the lands so granted were by the state conveyed to the plaintiff company in aid of the construction of a railroad in accordance with the purpose of the act. By the terms of the act, where rights had attached to any of the lands granted, lieu lands were authorized to be selected by agents of the state "subject to the approval of the Secretary of the Interior." While this language is not precisely the same as that contained in the act of March 2, 1899, the meaning is, in my judgment, substantially the same. In either case the selection must have the approval of the Secretary of the Interior. In discussing the status of the title to lands selected under the provisions of the Wisconsin act, and the taxability of the lands after they had been so selected and prior to the ap-

proval of the selection by the Secretary, Mr. Justice Field uses the following language:

"The approval of the Secretary was essential to the efficacy of the selections, and to give to the company any title to the lands selected. His action in that matter was not ministerial, but judicial. He was required to determine, in the first place, whether there were any deficiencies in the land granted to the company which were to be supplied from indemnity lands; and, in the second place, whether the particular indemnity lands selected could be properly taken for those deficiencies. In order to reach a proper conclusion on these two questions, he had also to inquire and determine whether any lands in the place limits had been previously disposed of by the government, or whether any pre-emption or homestead rights had attached before the line of the road was definitely fixed. There could be no indemnity unless a loss was established. And, in determining whether a particular section could be taken as indemnity for the losses sustained, he was obliged to inquire into the condition of those indemnity lands, and determine whether or not any portion of them had been appropriated for any other purpose, and, if so, what portion had been thus appropriated, and what portion still remained. This action of the Secretary was required, not merely as supervisory of the action of the agent of the state, but for the protection of the United States against an improper appropriation of their lands. Until the selections were approved, there were no selections in fact, only preliminary proceedings taken for that purpose; and the indemnity lands remained unaffected in their title. Until then, the lands which might be taken as indemnity were incapable of identification. The proposed selections remained the property of the United States. The government was, indeed, under a promise to give the company indemnity lands in lieu of what might be lost by the causes mentioned. But such promise passed no title, and, until it was executed, created no legal interest which could be enforced in the courts."

Thereupon the court states that:

"It follows from these views, that the indemnity lands described in the complaint were not subject to taxation as the property of the railroad company in 1883."

In principle I am unable to distinguish this case from the case at bar, so far as the selections under the act of March 2, 1899, are concerned.

As to the selections under the act of June 4, 1897, counsel for complainant vigorously urges that, before the equitable title passes, the selections must have the approval of the Secretary of the Interior and that such approval being evidenced in the record only by the issuance of the patents, the dates upon which the patents were issued should be accepted as the dates upon which the right of the selector first accrued and upon which the lands first became taxable. As already indicated, I am unable to accept this view. The act of 1897 does not in terms designate the person or officer by whom the selections shall be approved. While it is true, as contended, that, in the absence of special provisions to the contrary, the Secretary of the Interior has general supervision of the disposition of the public lands, it does not follow that such supervision must in all cases be personally exercised. It is a matter of common knowledge that, under the general rules and regulations promulgated by the Secretary of the Interior, inferior officers perform many functions in the disposition of public lands; and it is also a familiar fact that in cases of private entries of lands under the homestead or other laws, as soon as the final proof is submitted in the local office and payment made by the entryman and final certificate

issued as evidence of the acceptance of the proof and the purchase price, the entryman is recognized as being the equitable owner of the lands so entered, with substantially complete dominion over such lands, including the right of alienation; and, after final or patent certificate is thus issued by the local officers, such lands are held to be taxable. It is likewise competent for the Secretary, under general rules, to invest the Commissioner of the General Land Office with authority to approve lieu selections made under the provisions of the act of June 4, 1897, and this, I think, the Secretary has done. Whether the approval of the Commisioner is final and absolute or not is, in my judgment, immaterial. His action may still be subject to review by the Secretary, but nevertheless upon his approval the transaction is consummated. The action of the register and receiver in accepting the proof and issuing final certificate to the entryman, under the homestead laws, may be set aside, but that fact does not alter the general rule that, when they accept final proof and receive the purchase price of the land and issue final certificate, the entryman is to be treated as the equitable owner. Carroll v. Safford, 3 How. 441, 11 L. Ed. 671; Witherspoon v. Duncan, 4 Wall. 210, 18 L. Ed. 339. Paragraph 18 of the rules adopted by the Interior Department for the administration of the forest reserves under the act of June 4, 1897, provides that all applications or selections must be forwarded by the local officers to the Commissioner of the General Land Office for consideration, together with a report as to the status of the tract applied for.

Upon cross-examination, Fred Dennett, Assistant Commissioner of the General Land Office, whose deposition was taken upon behalf of the complainant in this case, stated that, as to the selections made under and by virtue of the act of June 4, 1897, the action of the Commissioner of the General Land Office is final and requires no action by the Secretary. Counsel for the plaintiff argues that in such construction of the law the witness was mistaken, in that under the general provisions of law the Secretary of the Interior has entire supervision of the disposition of public lands. But I do not understand the witness to mean that the action of the Commissioner is necessarily conclusive, or that his action is not, or could not be made, the subject of review by the Secretary of the Interior. I construe his answer to mean only that, under the rules and regulations promulgated by his superior, his approval of the selection, in the absence of an application for review to the Secretary of the Interior by an interested party, is sufficient basis for issuance of patent, and that patent is issued as a matter of course upon the Commissioner's approval. Any doubt as to the correctness of this view is, I think, dispelled by the decision of the Supreme Court in the case of Cosmos Co. v. Gray Eagle Co., 190 U. S. 301, 24 Sup. Ct. 860, 47 L. Ed. 1064, where, after quoting department rule No. 18, above referred to, the court says:

"The 'consideration' mentioned in rule 18 is clearly not of the character of a review of a decision already made by the local land officers, but is in the nature of an original consideration of the subject by the General Land Office, to which office the final decision belongs. The applications are to be forwarded, not a decision by the local land office, together with a report (not

a decision) as to the status of the land. This rule makes it the duty of the local land officers to merely forward the various applications to the General Land Office, and an original decision is to be made by the latter office upon the papers transmitted to it."

Indeed, as I read this decision, it is not only conclusive that equitable title does pass to the applicant upon approval by the General Land Office, but, also, that it does not pass until such approval is given. Speaking of the contention that the act of June 4, 1897, constitutes a standing offer on the part of the government to exchange any of its vacant lands open to settlement for a similar area of land in a forest reserve, and that whenever a person relinquishes to the government a tract in a forest reserve and places his deed of record, as required by the Land Department rules, and selects in lieu thereof a similar area of vacant land, open to settlement, such offer of the government has thereupon been both accepted and fully complied with, and that a complete equitable title to the selected lands is thereby vested in the selector, the court says:

"But even the complete equitable title asserted by complainant must, as it would seem, be based upon the alleged right of the local land officers to accept the deed and approve the selection, even though such approval may be thereafter the subject of a review in the nature of an appeal from the action of the local officers. There must be a decision made somewhere regarding the rights asserted by the selector of land under the act before a complete equitable title to the land can exist. The mere filing of papers cannot create such title. The application must comply with and conform to the statute, and the selector cannot decide the question for himself.

"We do not see how it can be successfully maintained that, without any decision by an official representing the government, and by merely filing the deed relinquishing to the government a tract of forest reserve land and assuming to select a similar area of vacant land open to settlement, the selector has thereby acquired a complete equitable title to the selected land. The selector has not acquired title simply because he has selected land which he claims was at the time of selection vacant land open to settlement, nor does the filing of his deed conveying the land relinquished and the abstract of title with it show necessarily that he was the owner of the land as provided for by the statute. So far as his action goes, it is an assertion on his part that he was the owner in fee simple of the land he proposed to relinquish, and that the deed conveys a fee-simple title to the government, and also that he has selected vacant land which is open to settlement, and that, therefore, he is entitled to a patent for such land. These assertions may or may not be true. Who is to decide? Complainant asserts that if a decision be necessary before the vesting of a complete equitable title that, in that case, the local officers are to decide that question, and, by accepting the deed and making the certificate already mentioned, they have decided it, and thereupon, at all events, the complete, equitable title accrued, even though such decision were subject to a review by the Commissioner of the General Land Office and thereafter by the Secretary.

"But, as has already been stated, there is nothing in the statute of 1897 which gives the local land officers the right to decide whether the selector has complied with the provisions of the act, and, unless those officers had that power, they did not acquire it by assuming to exercise it. We do not say that did so assume. They received, accepted and filed the deed, the abstract of title, the nonmineral affidavit, and the selection as made by Clarke. They entered that selection upon the official records of the land office, and they certified that it was free from conflict, and that there was no adverse filing, entry, or claim thereto, but it cannot be said that they decided that the selector had complied with the provisions of the statute or that he had done all that he ought to have done in order to acquire his alleged, complete equitable title.

"Their certificate that the land was free from conflict was simply a certif-

lcate as to what appeared on the books of the local office, and the same may be said of the statement that there was no adverse filing, entry, or claim thereto upon such books. No affidavit of nonoccupancy was filed, and they did not certify that the land so selected was, in fact, vacant or unoccupied, nor did they assume to certify that the selected land contained no minerals, although an affidavit to that effect was presented to them. In truth, all that these local officers did was to certify that the selector had done certain things, and that the land selected was vacant and open to settlement so far as it appeared from the books of the local land office.

"Taking into consideration, however, the fact that the statute did not vest the local officers with the right to decide upon the question of a compliance with its terms, and the further fact that the Land Department had adopted rule 18, above referred to, which provides for the forwarding of all applications for change of entry or settlement to the Commissioner of the General Land Office for his consideration, together with a report as to the status of the tract applied for, we must conclude that the action of the local officers did not, as it could not, amount to a decision upon the application of the selector, so that he became vested with the equitable title to the land he assumed to select. It is certain as we have already remarked, there must be some decision upon that question before any equitable title can be claimed—some decision by an officer authorized to make it. Under the rule above cited that decision has not been made. The General Land Office has (so far as this record shows) come to no conclusion in regard to it."

In the case of the State of Minnesota v. Itaska Lumber Co. (recently decided by the Supreme Court of the state of Minnesota) 111 N. W. 276, a certified copy of which decision has been furnished me, one of the syllabi is as follows:

"During the time which elapses between the filing of an application for the location of scrip upon certain lands belonging to the United States and the approval of the application by the Commissioner of the General Land Office, the land described is not subject to taxation by the state."

And in the course of its opinion the court says:

"But, before the land can be taxed by the state as the property of the beneficial owner, the perfect equitable title must be vested and the consideration fully paid to the United States. * * * The presentation of the scrip with an application to locate it upon certain land gave the applicant the preference over other subsequent claimants of the land, but, until the application was approved and acted upon by the commissioner, the applicant acquired no interest, legal or equitable, in the land as against the United States. During the intervening time, it might have been withdrawn from entry or disposed of by the government in some other manner. Payment for the land was not made until the scrip was approved and the receipt therefor issued."

And, speaking of the contention that the title or interest of the selector should by the application of the doctrine of relation be carried back to the date of the presentation of the scrip, the court says that such doctrine is never applied except when necessary to give effect to an act or instrument, the operation of which would otherwise be defeated, and that the doctrine has no application to a case of this character.

Among other cases in harmony with the view that the equitable title does not vest in the selector, and hence that he has no title which is subject to taxation by the state, until the selection is approved by some authorized officer of the government, are the following: Decision on Demurrer in this case, Judge Beatty; Sjoli v. Dreschel, 199 U. S. 564, 26 Sup. Ct. 154, 50 L. Ed. 311; Grant v. Railway

Co., 7 N. W. 113, 54 Iowa, 673; Musser v. McRae, 38 Minn. 409, 38 N. W. 103; Dickerson v. Yetzer, 6 N. W. 41, 53 Iowa, 681; Resser v. Carney, 52 Minn. 397, 54 N. W. 89; Page v. Price County, 64 Pac. 801, 25 Wash. 6; Lafeyette Lewis, 33 Land Dec. 43; William E. Moses, 33 Land Dec. 333. In this last-named case the opinion of Secretary Hitchcock is a very clear and instructive one, and in line with the decision in Cosmos Co. v. Gray Eagle Co., supra. Moses, like the railway company in this case, tendered to the local land office at Lewiston, Idaho, his application to select lands in lieu of forest reserve lands, a deed for the conveyance of which to the United States he furnished, together with his application. His application for the lieu lands having been rejected because of a defect in his title to the base lands, he requested the return of his deed and abstract. The Commissioner of the General Land Office denied his application. The Secretary, after stating that the possession of the deed by the grantor is presumptive evidence that the deed was never delivered, and the possession thereof by the grantee is presumptive evidence that it had been delivered and accepted, says:

"The owner of the land is entitled to the possession of his muniments of title. * * *

"Equitable title to land relinquished to the United States under the exchange provisions of the act of June 4, 1897, does not vest until examination and acceptance of the title by an authorized officer of the United States. [Here the Honorable Secretary quotes with approval from Cosmos Co. v. Gray Eagle Co., supra, and continues.] It is a transaction of exchange, and it is a necessary condition of title by exchange that there is 'a concurrent vestiture of title' to the things exchanged. * * *

"The deed having been delivered to officers of the United States for their inspection and acceptance and being found not acceptable, the United States has no claim to the land nor right to possession of the deed. The transaction, of which the conditional delivery was a part, having wholly failed, the deed never became operative, and the grantor is entitled to its return, that the grantee may be divested of the presumptive evidence of ownership."

In view of the doctrine thus enunciated both by the Land Department and by our Supreme Court as to the status of these lands and the title thereto during the period intervening between the date of the filing of the selection lists and the date of approval either by the Commissioner or by the Secretary of the Interior, I am unable to fully appreciate the suggestion made by counsel for the defendants that the revenue statutes of Idaho should enable the court in some way to distinguish this case and relieve defendants from the application of these general principles. It is suggested that the statutes of Idaho define improvements on public lands and possessory claims as real estate, and authorize the assessment and taxation of the same; but how does such a statute apply to the facts in this case? The revenue officers of the defendant county did not profess to assess improvements or possessory rights upon, or claims to, public lands, nor does the record show that the plaintiff had any improvements upon, or any possessory rights or claims to any of the lands in question. The lands were vacant, unoccupied, unimproved, unsurveyed public lands of the United States, which the railway company was offering to purchase as soon as the same could be surveyed and placed upon the market, by an exchange therefor of other lands which it claimed to

own. Its right, if it could be accurately called a right at all, was not so great or so tangible as that of a qualified entryman who has filed his application to enter 160 acres of land under the homestead laws and, who has placed no improvements upon the land applied for, and who has never been in the actual possession of the same. What does such an applicant acquire, by his mere application, that is subject to taxation? If he takes actual possession of the land and places improvements upon the same, he has property interests which come within the statutory definition of improvements and claims to, or possessory rights upon, public lands. But in this case the selector, not only had no improvements upon and was not in the actual possession of the lands, but it had no right to the possession. If, as stated by Mr. Justice Field in Railroad Company v. Price County, supra, the exception to the general doctrine that land to which the government holds the legal title is not subject to taxation "is founded upon the principle that he who has the right to property, and is not excluded from its enjoyment, shall not be permitted to use the legal title of the government to avoid his just share of state taxation," upon what theory can the exception be extended to embrace this case? It is not contended, and in my view could not successfully be asserted, that, when the railway company filed its selection lists and deeds and abstracts, it had the right to take possession of the selected lands, and exercise dominion over them and cut therefrom the timber. But, if it did not have the title and did not have the right of possession or the right of use, upon what theory of law or equity could it be required to pay taxes? It is interesting and pertinent in this connection to refer to the United States v. Montana Lumber Co., 196 U. S. 573, 25 Sup. Ct. 367, 49 L. Ed. 604, where the Northern Pacific Railway Company, having, by the construction of its road, fully earned certain lands under the act granting to it lands along the line of its road, before said lands were surveyed, sold the timber standing thereon to the Montana Lumber Company, and the latter company, having determined to its satisfaction, by the employment of private surveyors, where said lands were located, proceeded to cut and manufacture the timber growing thereon, and the court held that, notwithstanding the lands had been earned, neither the railway company nor its grantee had any right to go upon said lands and cut therefrom the timber until they had been definitely located and identified by government surveys. Counsel for the defendants cite no decision or departmental regulation or rule by which, or in harmony with which, the railway company or the plaintiff would have been justified in taking possession of or using these lands or any part thereof prior to the approval of the selection by the proper officers.

It is suggested that the complainant has come into a court of equity asking equitable relief, and that, therefore, it should be required to do equity. The principle is, of course, correct, but just what application is sought to be made of it is not quite clear. In this connection the question is asked by counsel why should the settler who entered 160 acres of timber land in Shoshone county in the year 1901, and paid the purchase price therefor, have been subject to taxation by the state at

all times since, and the Timber Company here, or the railroad company, which selected these lands, be exempt from taxation? The distinction is obvious. As soon as the person referred to as a "settler" had entered 160 acres of land and paid the purchase price therefor, he became the owner of the equitable title, and, as soon as patent issued, of the legal title. But, whether patent issued or not, as soon as he paid the purchase price and received his final certificate or certificate of patent, he was recognized as the owner of the land, including the timber growing thereon. He had the right to take possession of the land and to use it, and to appropriate to his own use and benefit its products. In other words, his dominion over the land and its products became absolute. But, suppose that, between the time the "settler" made his application and the time certificate of patent or final certificate was issued to him, the land had been assessed, would it be contended that such assessment was either legal or equitable? During such time the "settler" had neither title to nor the right to use or exercise dominion over the land; and his case would be analogous to that of the plaintiff.

It is further suggested by counsel for the defendant that the Northern Pacific Railway Company, in releasing the base lands, released lands which were subject to taxation, and presumptively, it is stated, the lands so released were of less value than those selected in lieu thereof; but, even if we adopt such an assumption, how can it avail the defendant? It clearly appears from the letter of the Assistant Commissioner of the General Land Office, dated February 8, 1905, hereinbefore referred to, that the department was requiring the railway company to keep the taxes levied upon the base lands, paid up to the time the selections were approved in 1905, and it logically follows from the Moses decision and the Lewis decision (33 L. D., cited supra) that the base lands where title has passed to the selector, so that they are subject to taxation, continue to be the property of the selector, and hence subject to taxation in the state where they are situated, until the conveyance thereof is accepted and the proper exchange is consummated by the approval of the proper officers of the Land Department, and that, therefore, it is incumbent upon the selector, the Railway Company in this case, not only in order that the Government may accept its offer, but for its own protection if, for any reason, its offer is rejected by the government, to pay the taxes upon the base lands levied during the pendency of its application or selection. If, therefore, the lands in question in this case were, prior to the approval of the selections, subject to taxation as being the property of the railway company and the plaintiff, its grantee, then it logically follows that during the pendency of its application the selector must pay taxes both upon its own property and that of the United States, for at no given time could it be held that it was the owner both of the base and of the lieu lands. In their brief the defendants have cited Central Pacific Railway Co. v. Nevada, 162 U. S. 512, 16 Sup. Ct. 885, 40 L. Ed. 1057, and Northern Pacific Railway Company v. Meyers, 172 U. S. 588, 19 Sup. Ct. 276, 43 L. Ed. 564, as being in support of their contention, but both of these cases involve the construction and ap-

plication of an act of July 10, 1886 (24 Stat. 143, c. 764 [U. S. Comp. St. 1901, p. 1476]), by which it is expressly provided that lands granted to a railroad corporation by an act of Congress shall not be exempt from taxation on account of any lien of the United States upon the same for the costs of surveying, selecting, and conveying the same, or because no patent has been issued therefor. This act expressly provides that it shall not apply to unsurveyed lands, and that any lands sold for taxes shall be taken by the purchaser subject to the lien of the United States for costs of surveying, etc., and all liens and mortgages in favor of the United States, and that the act shall only apply to lands situated adjacent to and coterminus with completed portions of the railroads for aid in construction of which they were granted. It is obvious that the act is not applicable to the lands in question, and it is also clear that, in the absence of such a statute, the rule would be different. Railway Co. v. Prescott, 16 Wall. 603, 21 L. Ed. 373; Railway Co. v. McShane, 22 Wall. 444, 22 L. Ed. 747; Railway Co. v. Rockne, Treasurer of Traill County, 115 U. S. 600, 6 Sup. Ct. 201, 29 L. Ed. 477.

It is further suggested that, inasmuch as the railway company gave and the plaintiff accepted a deed covering and attempting to convey these lands from the railway company to the plaintiff in July, 1901, the defendant county had a right to assess and tax said property. However, no theory of law in support of this suggestion is outlined or defined. The giving and the acceptance of such a deed might constitute prima facie evidence of the private ownership of the lands; but, even so, this prima facie showing is overcome by the undisputed facts relating to the title. Estoppel is not pleaded as it must be if relied upon, nor is it argued that the giving and the acceptance of the deed are sufficient to constitute estoppel. Nor does the provision of the conveyance relieving the railway company from the payment of taxes which might be levied upon the lands, expressly or impliedly, create the right or enlarge the right of the county to assess the lands. The instrument was a private contract between the railway company and the timber company, and was not made for the benefit of the county. The railway company desired, and had the right, to relieve itself from any responsibility to the timber company for any taxes which might be levied; and the timber company was willing and had the right to assume the responsibility of paying the taxes. But it cannot be presumed that they contemplated illegal assessments, or the payment of tax claims which were void. The status of the lands for assessment purposes was uncertain. No one could anticipate just when they would become subject to assessment. The action of the Land Department could not be anticipated, and naturally the parties could not certainly foretell just what rule of law the courts would apply to the facts. The parties, therefore, had the right to contract in such manner that one was relieved from and the other assumed the burden of such taxes as might be levied (legally, of course) against the property. But, as against the county, such contract could not estop the parties from questioning the legality of the tax claim.

It is suggested, but not urged, by counsel for defendants that, if

the plaintiff did not have equitable title to the lands in 1903 and 1904, it has no standing in court, for in that case it could not be injured by the assessment and sale. At the time the bill was filed, the complainant was the owner of the lands embraced in the first three groups described in the complaint. It is so alleged and admitted. The allegations relative to the fourth group of land, so far as the complainant's interest therein is concerned, are anomalous, and, had appropriate objection been made, I do not see how the bill could have been sustained so far as it relates to that group. There is no allegation that the complainant, when the bill was filed, had any interest whatever in any of the lands embraced in this group, but no specific objection was made, and, by agreement, proof was made showing that at the time of the filing of the bill the railway company had attempted to convey these lands, together with those embraced in the other three groups, by the deed referred to as having been executed in 1901, so that the complainant's interest in these lands was really the same as its interest in the other groups; and now it appears it is the absolute owner of them.

. It is not sufficient to say that, if the complainant did not have legal title or equitable title to the lands at the time the taxes in question were levied, it has suffered and can suffer no injury by reason of the acts, and threatened acts, of the defendants, and that, therefore, it is not in a position to ask for equitable relief. It appears that not merely the interest of the railway company or the interest of the complainant was assessed and sold, but the lands and the entire title thereto were assessed, and, the taxes thereon having become delinquent, the lands and the entire title thereto were sold; and it further appears that, if redemption is not made within the time prescribed by the statutes of Idaho, deed will be executed conveying to the defendant county, or its assignee, the lands. It can hardly be seriously contended that the spreading of the assessment upon the assessment books of the county, the subsequent advertisement, and sale, and the placing of the certificate of sale upon the records of the county, and the threatened execution, by the tax collector, of a deed purporting to convey these lands, and the placing of such deed of record, will not create a cloud upon the title. It is obvious that when such deed is executed, and the county claims thereunder to be the absolute owner of the lands, the plaintiff can maintain an appropriate proceeding to try out the general question of title, and thus determine the validity of the tax sale. In such a proceeding substantially the indentical issues of fact and of law now presented would have to be determined. If the plaintiff should remain inactive and await the issuance of the tax deed before challenging the validity of the proceedings, would it not become subject to the possible charge of laches or the defense of estoppel? Equity favors the vigilant, and, both in reason and upon authority, I think the complainant is properly in court. Railroad Co. v. Price County, 133 U. S. 496, 10 Sup. Ct. 341, 33 L. Ed. 687; Railroad Co. v. McShane, 22 Wall. 444, 22 L. Ed. 747. As I have already indicated the filing jackets in the Commissioner's office covering the selections under the act of June 4, 1897, bear indorsements of an earlier and of a later

approval by the Commissioner, and, for reasons which appear to me to be conclusive, I have adopted the date of the later approval as the time when equitable title passed. But, if the earlier dates should be adopted, there would still be cogent reasons for holding the tax proceedings invalid. For the purpose of assessment in any given year, the title, value, and status of all property within the state of Idaho are to be considered and fixed as of the second Monday in January of that year, which in 1904 was January 11th. The surveys of the townships in which all of these lands are situated were not approved by the Commissioner of the General Land Office until January 15, 1904, and were filed in the local land office February 24, 1904. Apparently the rule is that unsurveyed lands are not taxable, and the survey is not completed until the same is accepted by the Land Department. This proposition has been elaborately argued by counsel for complainant, and the defendants have not controverted it. Central Pacific Ry. Co. v. Nevada, 162 U. S. 512, 524, 16 Sup. Ct. 885, 40 L. Ed. 1057; State v. Central Pacific Ry. Co., 25 Pac. 442, 21 Nev. 94; Stoneroad v. Stoneroad, 158 U. S. 240, 15 Sup. Ct. 822, 39 L. Ed. 966; United States v. Montana Lumber Co., 196 U. S. 573, 25 Sup. Ct. 367, 49 L. Ed. 604; Clemmons v. Gillette (Mont.) 83 Pac. 879; Robinson v. Forest, 29 Cal. 325; Territory v. Persons, 76 Pac. 316, 12 N. M. 169; Tubbs v. Wilhoit, 138 U. S. 134, 11 Sup. Ct. 279, 34 L. Ed. 887; Act March 3, 1899, c. 424, 30 Stat. 1097 [U. S. Comp. St. 1901, p. 1541]. And, indeed, the revenue statutes of Idaho impliedly negative the idea that unsurveyed lands are assessable. Section 1346 of the Political Code (Annotated) provides:

"The assessor must have prepared and platted a full, accurate, and complete plat book of his County, in which shall be platted all townships which have been officially surveyed and platted by the United States Government."

Nothing is said about unsurveyed lands.

Again, even if the selections under the act of June 4, 1897, were assessable by reason of the first approvals of the Commissioner in 1903 and 1904, the selections under the other acts not having been approved and hence not being assessable, the entire assessment, it is contended, is void, because the lands under all of the selections were grouped and assessed as a unit. In other words, it is asserted by complainant, and not controverted by defendants, that a joint and unapportioned assessment of taxable and nontaxable property is void in toto. And the proposition seems to be amply supported by authority. See California v. Railway Co., 118 U. S. 417, 6 Sup. Ct. 1144, 30 L. Ed. 125; California v. Railway Co., 127 U. S. 1, 8 Sup. Ct. 1073, 32 L. Ed. 150; Trust Co. v. Territory, 62 Pac. 987, 10 N. M. 416; Title Trust Co. v. Aylsworth, 66 Pac. 276, 40 Or. 20; Hart v. Smith, 64 N. E. 661, 159 Ind. 182, 58 L. R. A. 949, 95 Am. St. Rep. 280; Railroad Co. v. Phillips, 82 N. W. 767, 111 Iowa, 358; Lancy v. City of Boston, 71 N. E. 302, 186 Mass. 128; Towne v. Salentine, 92 Wis. 404, 66 N. W. 395; Johnson County v. Tierney, 76 N. W. 1090, 56 Neb. 514; Howcott v. Levee Dist., 46 La. Ann. 322, 14 South. 848; Sims v. Warren, 67 Miss. 278, 7 South. 226; Jennings v. Collins, 99 Mass. 29, 96 Am. Dec. 687; East Tenn. Ry. Co. v. Morristown (Tenn. Ch. App.) 35

S. W. 771; Fisk v. Corey, 141 Pa. St. 334, 21 Atl. 594; Strode v. Washer, 17 Ore. 50, 16 Pac. 926; Howe v. People, 86 Ill. 288.

However, I do not decide what, if any, application this principle would have to the record in this case if it appeared that a part of the lands in evidence were subject to taxation. I am of the impression that I would seek hopefully for some method under the law by which the plaintiff would be required to pay a just proportion of the taxes before it received protection against that which was unjust. But, it being my view of the law that none of these lands were subject to taxation in 1903 and 1904, complainant's prayer is not beset with any equitable objections. It had and has no duty either at law or in equity to pay these taxes in whole or in part. If it was under obligation to convey to the United States a title to the base lands, absolute and free from lien or incumbrance on the date the exchange was consummated—that is, the date of approval by the proper officers of the Land Department—it had the reciprocal right to receive title to the lieu lands free from lien or incumbrance upon that date. The suggestion that the lieu lands were of greater value than the base lands, even if it were founded upon the record, cannot be entertained. The propriety of the act authorizing the exchange was for the exclusive consideration of the legislative branch of the government. Nor can I be influenced by a consideration of the vast extent of the lieu selections. The law is the same for the timber company as it is for the homesteader, and I doubt whether it would be seriously urged that there were any very strong equities in favor of the defendant, if after a homesteader in a forest reserve had made application to exchange his homestead for land outside of the reserve, and before his offer of exchange was accepted, and while he neither had title to the land applied for, nor possession of or the right to use the same, it sought to levy and to enforce the payment of a tax thereon. In principle such is the case presented by this record.

I have no disposition to assist parties in escaping a just proportion of the burden of taxation on account of technical defects in the proceedings of revenue officers in levying and enforcing the payment, of taxes; but the plaintiff's resistance is not based on such grounds. Its claim is that the property was not subject to taxation—not that the assessor and the other officers of the defendant county did not proceed regularly, but that they were without jurisdiction, and hence that the entire proceedings were void. To compel the plaintiff to pay these taxes would, in effect, be to require it to pay taxes both on the base lands and the lieu lands for the same year—a manifest injustice.

It follows that the relief prayed for must be granted.